322 So.2d 233 (1975)
Janice F. RUSSO
v.
Lemie J. GUILLORY, Jr., et al.
No. 7080.
Court of Appeal of Louisiana, Fourth Circuit.
November 11, 1975.
Rehearing Denied December 9, 1975.
Writ Refused January 30, 1976.
*234 Thomas L. Giraud, New Orleans, and C. Verderame, Metairie, for plaintiff-appellee.
Reuter & Reuter, Arthur C. Reuter, Jr., New Orleans, for defendants-appellants.
Before SAMUEL, LEMMON and MORIAL, JJ.
LEMMON, Judge.
In this vehicular accident case defendants have appealed from a judgment rendered after trial on the merits, questioning both liability and quantum.

I
The late rainy afternoon collision occurred on U. S. Highway 51 in St. John the Baptist Parish, just south of the Pass Manchac bridge. At that point the undivided north-south highway consisted of two lanes. Just prior to the accident, both plaintiff's car and defendants' 38-foot trailer-tractor unit were traveling south. To their left as they descended the raised bridge were a number of business establishments. The descending portion of the bridge measured about 400 to 550 feet in length from the crest to grade level.
The truck driver testified: He was traveling at 30 miles per hour across the bridge. When he was about halfway down the bridge, he detected in his left side rearview mirror that the trailer was beginning to move slowly into the northbound lane. Fearing the trailer would jackknife, he immediately applied the hand brake to lock the wheels of the trailer and slow it down, and then shifted down one gear to gain power to pull the tractor away from the trailer, after which he was 25 to 30 feet from the bottom of the bridge. The hand brake failed to lock the trailer wheels, and when the trailer's left side hit the abutment at the base of the bridge, he headed the tractor (which had never left the proper lane of travel) toward the right shoulder of the road. The unit thereafter slid sideways down the highway until the front of the tractor struck the side of a parked truck, located at the right or west shoulder about 40 to 50 feet from the base of the bridge.
Other witnesses established that just as (or just before) the truck came to rest perpendicularly across the highway, plaintiff's car (which had been following the truck unit) struck the rear corner of the trailer and plunged into a ditch adjacent to the east shoulder of the highway. The point of impact was in the northbound lane. Defendants' unit at rest blocked the entire southbound lane and approximately half of the northbound lane.
Plaintiff's version of the occurrence was: When she was approximately half-way down the bridge traveling at about 40 *235 miles per hour, she noticed the truck trailer (at least two or three car lengths ahead) moving to the left. She then rested her foot on the brake, since the truck appeared to be pulling off toward the left shoulder where a restaurant (known to her to be a popular truck stop) was located. She first realized something was wrong when she saw the cab of the truck start back to the right across the highway, at which time she was near the base of the bridge. She immediately applied her brakes and swung her car to the left, but the right side of her car struck the right rear corner of the truck trailer and then continued into the ditch.
Two witnesses, with different perspectives from inside and outside of business places at the foot of the bridge, testified that they looked up immediately when they heard brakes screeching and saw the truck 50 to 100 feet (the other estimate was 80 or 90 feet) up the bridge. One stated that the tractor struck the opposite abutment at the foot of the bridge, while the other stated that the trailer just missed the abutment when it came around.
Defendants' Liability
Citing language in Barret v. Caddo Transfer and Warehouse Co., Inc., 165 La. 1075, 116 So. 563 (1928), that "skidding may occur without fault . . . under circumstances not necessarily implying negligence", defendants argue that the doctrine of res ipsa loquitur does not apply in cases involving skidding and that plaintiff failed to prove any specific negligence.
In Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621 (1972), the Supreme Court demystified the doctrine of res ipsa loquitur and held that a plaintiff's evidence (direct or circumstantial) in any negligence case entitles him to judgment when the evidence taken as a whole shows the defendant's negligence as the most plausible or likely cause of the damages.
A motorist's duty of reasonable care includes the duty to keep his vehicle under control. In the present case plaintiff proved that the defendant driver failed to keep his truck under control, and the defendants introduced no evidence to explain the cause of his failure of control. The evidence taken as a whole thus shows the most likely cause of the accident was defendant driver's breach of his duty to maintain control. We therefore conclude that defendants are liable for plaintiff's damage unless her contributory negligence bars her recovery.
Contributory Negligence
Referring to defendant driver's testimony that he traveled 250 to 300 feet from the first sign of trouble until his collision with the parked truck, defendants contend that the truck's sliding down the bridge for that distance should have immediately alerted plaintiff to the emergency situation and that plaintiff had sufficient time thereafter to avoid the accident if she had braked immediately rather than resting her foot on the brake and ignoring the signs of danger until it was too late.
Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection, the standard being that of a reasonable man under like circumstances. Smolinski v. Taulli, La., 276 So.2d 286 (1973). In measuring plaintiff's behavior in the present case, we are faced with somewhat conflicting versions of the occurrence. Defendants, choosing the most favorable facts as to time and distance, urge that plaintiff should have been alerted to the emergency situation immediately and had as much as 300 feet within which to react and bring her car to a stop without striking the truck. However, the trial judge apparently rejected defendants' version of the occurrence, as re-urged on appellate review. Furthermore, neither the defendant driver nor the witnesses testified that the truck unit slid down the bridge sideways, but rather that the sliding began when the cab *236 veered to the right after reaching the bottom of the bridge.
Under plaintiff's version, apparently accepted as credible by the trial judge, she was traveling at 59 feet per second, lifted her foot from the accelerator (thereby decelerating slightly) and placed it on the brake when she saw the trailer moving to the left, and applied the brakes and veered to the left immediately upon the first definite indication of trouble when the cab suddenly veered back to the right. This behavior meets the standard of conduct for a reasonable person under like circumstances, as viewed from plaintiff's vantage point. We conclude that defendants failed to prove plaintiff was contributorily negligent.

II
After the February 29, 1972 accident, plaintiff received stitches and other treatment at a nearby hospital and was then taken home. The next morning she consulted Dr. Ignatius Tedesco, a general surgeon who was her longtime family physician. His examination revealed considerable limitation of neck motion, tenderness and spasm in the trapezius muscle, brachial plexus and occipital nerve pain on palpation, lacerations of the neck and knees, and multiple hematomas of the hip, thigh, calf and buttocks. X-rays were reported as normal. He diagnosed cervical strain and prescribed diathermy, traction, medication and absolute bed rest for ten days.
Plaintiff returned to work as a school teacher after nine days.
Dr. Tedesco's staff administered diathermy, traction and B-12 injections (to provide nutrition to the sheath of the nerves) daily, and he examined plaintiff weekly through the first part of June. During this time plaintiff complained of constant pain and during one period had even immobilized her left arm to minimize the pain.
The same pattern of treatment was thereafter followed with less frequency, and decided improvement was accomplished by mid-August. Plaintiff continued improving, and when she exhibited minimal symptoms on November 16, 1972, the doctor discharged her. She testified that she was still having moderate, infrequent pain at the time.
In April, 1973 plaintiff returned to Dr. Tedesco, complaining of a recurrence of severe symptoms in the neck, arms and shoulders. He found marked cervical spasm and began her on the same regimen of treatment previously used. In June and July plaintiff attended a geology seminar in Colorado and participated in outdoor activities, and she required medical attention on three occasions. She returned to Dr. Tedesco's care in August and continued until the time of trial in March, 1974.
In a January, 1974 neurological consultation, which Dr. Tedesco had recommended because of plaintiff's persistent symptomatology, Dr. Donald Richardson found tenderness on palpation of the neck, discomfort at extremes of neck motion, a decrease in size of the left tricep and deltoid muscles and arm circumference, and a slight narrowing of the disc space at C-5, revealed by X-rays. He testified that the disc narrowing indicated atrophy of the disc cartilage, which can be caused by trauma and which would manifest itself six months or more after the injury. Because of these findings and the history, and because plaintiff's complaints were consistent with this type of injury, the doctor related plaintiff's present complaints to the automobile accident. He had not examined previous X-rays, but he stated a prognosis that if the disc space was narrowing, it would probably continue to do so and further degeneration would occur. He did not recommend surgery at the time, but his findings warranted continued medical care indefinitely. He also recommended periodic X-rays, since progressive degeneration *237 often requires surgical correction after long periods of persistent, intermittent neck pain.
Plaintiff also had been examined at defendants' request by a neurosurgeon in October, 1973. Dr. Richard Levy found only slight limitation of neck motion and slight tenderness over the cervical spine. He reviewed X-rays taken on that date and concurred in the radiologist's report that the "vertebra appear normal in contour, structure and dimensions and the disc spaces of average height."
At time of trial plaintiff complained of neck and shoulder pain, with frequent headaches. She was using heat treatments and medication for relaxing muscles.
After reviewing the evidence, we conclude that the medical testimony, although conflicting, supports the trial court's apparent finding that plaintiff was still suffering cervical pain at the time of trial and that this suffering was caused by the accident two years earlier. We further conclude that the award of $9,000.00 for pain and suffering is not an abuse of the "much discretion" vested in the trial judge by C. C. art. 1934(3).
Furthermore, we believe that plaintiff has proved by the requisite preponderance of evidence that persistent, intermittent episodes of pain will continue and require future medical care and treatment. While no specific cost or duration was suggested in Dr. Richardson's testimony, we find the awards of $1,500.00 for future medical expenses and $2,000.00 for future pain and suffering to be reasonable in view of plaintiff's age (26 years at time of trial), the severity, frequency and duration of her past problems, and the established likelihood of continuance into the future.
Defendants' other complaint as to the amount of the judgment relates to the awards of $10,000.00 for a neck scar and $2,000.00 for scars on both legs. The trial judge described the neck scar resulting from the puncture wound as "an inch or so long" and "better than an eighth of an inch wide", with a visible sign of a suture in the middle and redness around the scar a half inch on each side. Plaintiff testified that she adjusted her hair style and dress in an attempt to cover the disfigurement. Additionally, there was a starshaped scar below the left kneecap and five small scars in various places on the right knee.
While the awards appear generous, especially in relation to the award for pain and suffering, we cannot say that the awards to this unmarried young lady constitute an abuse of the trial judge's "much discretion".
Plaintiff concedes a mathematical error of $1,000.00 in the computation of the award.
Accordingly, the judgment is amended to reduce the award by $1,000.00. As amended, the judgment is affirmed.
SAMUEL, J., concurs and assigns reasons.
SAMUEL, Judge (concurring).
At the request of the defendants, plaintiff was present in this court on the day of argument and the panel observed the neck scar in suit. Although containing a slight depression because of its width, the scar is small and well healed. Cosmetically, and the cosmetic effect is the sole basis for the award for this item, it detracts very little. Accordingly, I am of the opinion that the amount awarded for the scar on the neck is excessive to the extent that it constitutes an abuse of the discretion afforded the trial court by Civil Code Article 1934(3). However, the record regarding all of the injuries, residuals, pain and suffering satisfies me that the total award of $24,500, although higher than I would have awarded originally, is not so excessive as to constitute an abuse of the trial court's discretion.
Therefore, I respectfully concur.