528 So.2d 734 (1988)
Glenna L. KOURY, Individually and on Behalf of Jessica Mae Baker and Lawrence C. Hendricks and James C. Woods, Plaintiff-Appellant,
v.
LANIER EXPRESS, INC., Robert F. Vergamini and Hanover Insurance Company, Defendants-Appellees.
No. 87-284.
Court of Appeal of Louisiana, Third Circuit.
May 18, 1988.
*735 Hawley & Schexnayder, W. Paul Hawley, Lafayette, for plaintiff-appellant.
Voorhies & Labbe, Keitha Leonard, Lafayette, for defendants-appellees.
Before DOMENGEAUX and GUIDRY, JJ., and REGGIE[*], J. Pro Tem.
EDMUND M. REGGIE, Judge Pro Tem.
The main issue presented by this appeal is whether or not the trial court's damage award was inadequate.
This is a tort action instituted by plaintiff, Glenna L. Koury, against the defendants, Robert Vergamini, his employer, Lanier Express, Inc., their liability insurer, Hanover Insurance Company, seeking recovery for physical, emotional, and psychological injuries that she sustained on October 5, 1984, when the vehicle in which she was a passenger was struck in the rear by a tractor-trailer owned by Lanier Express, Inc. and being driven by Mr. Vergamini for Lanier. At trial, defendants admitted liability for the accident but did not stipulate that plaintiff's alleged medical problems were in any way related to the accident.
After presentation of the evidence and testimony, the trial court took the matter under advisement. In written reasons for judgment assigned on January 6, 1987, the trial court awarded plaintiff the sum of $34,387.53, which represented $10,000.00 for plaintiff's psychological problems including future medical expenses therefor, $12,000.00 for ankle injuries, $2,000.00 for neck and/or back injuries, $1,500.00 for headaches, and $8,887.53 for past medical expenses. A judgment to that effect was signed on January 23, 1987. Plaintiff appeals complaining of an inadequate award of damages. We affirm.

FACTS
The facts upon which this suit is based are basically undisputed. The accident occurred at 12:26 A.M. on October 4, 1984, when Lawrence C. Hendricks was driving a school bus in which his girlfriend, Glenna L. Koury, their daughter, Jessica Mae Baker, and their friend, James Woods, were passengers. The bus was struck from behind by a tractor-trailer driven by Robert F. Vergamini. The impact of the collision caused the bus to roll over and then land approximately 378 feet from the point of *736 impact. At the time of the accident, they were enroute to Texas where Woods had led them to believe that he had a job waiting for him and that he would attempt to also get a job for Hendricks once they arrived. The bus had been converted into a motor home and was equipped with a bed, kitchen appliances, and bathroom facilities.
Just prior to the accident, plaintiff was asleep in a bed located at the rear of the bus, with the baby asleep in a bassinet on the floor next to her. Her only recollection of the accident was seeing bright lights, hearing a loud noise, and feeling that they were flying. She was knocked unconscious and did not regain true consciousness until she awoke at the University Medical Center in Lafayette. Although she could not remember her actions during the aftermath of the accident, State Trooper Bernard, who investigated the accident, recalled that plaintiff was highly upset, panicky and crying hysterically because she was worried about her child. He also recalled that plaintiff had hurt one leg and was hopping around trying to locate her daughter. He stated the child was located and placed in the ambulance with her, which helped to calm her down.
After arrival at the University Medical Center in Lafayette, it was determined that plaintiff's ankle was broken and an operation was performed and a pin inserted. Plaintiff testified that she started experiencing pain in her ankle, back, neck, elbow and right knee during her stay in the hospital. She also remembered having stitches in the upper right corner of her forehead. After three days in the hospital, plaintiff was released and returned to Slidell, Louisiana. After returning to Slidell, plaintiff sought medical treatment from several medical providers for physical and emotional problems that manifested themselves shortly after the accident and initial treatment period.
On March 27, 1985, all four of the passengers of the bus filed suit against Mr. Vergamini, his employer, Lanier Express, Inc., and its insurer, Hanover Insurance Company. Plaintiff sought damages for psychological injuries, an ankle injury, bowel problems, neck and back pains, headaches, temple pains, abdominal pains, and deterioration of her eyes. She also maintained that she was entitled to loss of future wages because these injuries impaired her earning capacity. Prior to trial, all of the plaintiffs' claims were settled and their suits dismissed, except for those asserted by Mrs. Koury.
A trial on the matter was held on December 29, 1986. At the beginning of trial, the defendants stipulated to complete liability and that Hanover Insurance Company was the liability insurer for Lanier Express, Inc. and its employee, Mr. Vergamini, with liability limits up to $500,000.00 at the time of the accident. At trial they asserted that, with the exception of plaintiff's ankle injury, there was no causal connection between her alleged injuries and the accident.
Following trial, the matter was submitted for judgment. Reasons for judgment were assigned on January 6, 1987 and the judgment in conformity with the reasons for judgment was signed on January 23, 1987. In his written reasons for judgment, the trial judge itemized the general damage award as follows: $10,000.00 for plaintiff's psychological injuries and future psychiatric medical expenses; $12,000.00 for plaintiff's fractured ankle; no compensation was awarded for lost wages, bowel problems, abdominal pain, deterioration of the eyes and jaw and temple pain; $2,000.00 for plaintiff's cervical muscle strain; and $1,500.00 for headaches allegedly due to the accident. In addition to the general damages, the trial judge awarded $8,887.53 for past medical expenses.
Plaintiff appeals from this judgment assigning the following errors:
(1) The trial court erred in rejecting the great weight of evidence provided by expert witness psychiatric and medical testimony, psychiatric and medical records and the testimony of Mrs. Koury and lay witnesses that Mrs. Koury had sustained a chronic disabling post traumatic stress disorder as a result of the accident;
(2) The trial court erred in rejecting the great weight of evidence provided by *737 expert witness medical testimony, medical records, and the testimony of Mrs. Koury and Mr. Hendricks that Mrs. Koury had sustained severe, painful, disabling, and permanent injuries to her head, eyes, jaw, teeth, neck, right arm, back, abdomen, and left leg, ankle, and foot as a result of the accident.

QUANTUM
Plaintiff contends the general damage award of $25,500.00 constituted an abuse of discretion in light of the evidence presented at trial and should be raised to $150,000.00.
LSA-C.C. Art. 2324.1 provides:
"In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury."
Before this court can disturb an award made by the trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. Perniciaro v. Brinch, 384 So.2d 392 (La. 1980); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Only after making such a finding can the appellate court disturb the award, then only to raise inadequate awards to the lowest amount the trial court could have reasonably awarded, or lowering excessive awards to the highest amount the trial court could have reasonably awarded. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco, supra; Freeman v. Harold Dickey Transport, Inc., 467 So.2d 194 (La.App. 3 Cir.1985).
A trial court's award may also be disturbed if it was based on a manifestly erroneous or clearly wrong finding of fact. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). This principle is particularly applicable when it involves credibility of witnesses as does the present case. Dugas v. Mouton, 460 So.2d 739 (La.App. 3 Cir.1984).
In addition, recent cases have held that the manifest error standard of appellate review should be applied even in cases such as the instant one in which the majority of the evidence before the court was submitted in the form of deposition and written reports. Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825 (La.1987); Guaranty Bank & Trust Co. of Alexandria, La. v. Holiday Inn of Leesville Partnership, 525 So.2d 638 (La. App. 3 Cir.1988). Therefore, we will refrain from disturbing the trial court's damage award absent a finding that it is manifestly erroneous or that there was a clear abuse of its discretion.
A. Damages for Post Traumatic Stress Disorder
At trial, plaintiff testified that several days after the accident she started having nightmares in which she experienced anew the trauma and events associated with the accident. She stated these reoccurred almost every night for several weeks following the accident. According to her testimony, she has continued to experience the nightmares; however, the frequency has diminished to two or three times a month. She described the nightmares as being typically the same; she dreams that she is inside the bus after the accident looking for Jessica, and finding the baby all cut up and bloody. She also reexperiences her feelings of being crushed.
In addition to the nightmares, other emotional problems have manifested themselves after the accident. Plaintiff testified that she becomes very anxious when she drives an automobile on the highway, especially when she notices an automobile following closely behind her. She further stated that she has become very withdrawn and very protective of Jessica. Plaintiff also testified that she has flashbacks, a fear of lights on the highway, and a fear of falling. A review of the deposition testimony submitted into evidence by the parties indicates that plaintiff was examined by numerous psychiatrists for these emotional and psychological problems that arose subsequent to the accident.
On April 19, 1985, plaintiff first saw Dr. Hiram G. Haynie, Jr., a psychiatrist at Slidell Mental Health and Substance Abuse Clinic. In deposition testimony, Dr. Haynie *738 recalled that plaintiff complained of experiencing frequent nightmares wherein she experienced anew the entire accident, or at least fragments of the accident. She also told Dr. Haynie that in her dreams, she experiences a fear of discovering her daughter dead and, at that point, she would always wake up in a state of fright. She mentioned having thought at the time of the accident that her and her daughter were dying, or had died. He opined that the nightmares were, in part, a recall of these fears. Dr. Haynie also recalled plaintiff mentioning that her energy level had decreased, that she had become very irritable, was less outgoing, and had a decreased appetite. Plaintiff also indicated that she often started to cry without any reason, and did not get along with Mr. Hendricks since the accident. She described her relationship with Mr. Hendricks as unhappy because he had a serious alcohol problem, was not working regularly, and was not helpful around the house. She felt discouraged because of the lack of support from him. Dr. Haynie noted that plaintiff summarized her unhappy past life in detail up until the time she met Mr. Hendricks. The history she reported to Dr. Haynie and subsequent psychiatrists was identical to the testimony which she gave at trial.
In his review of the evidence pertaining to plaintiff's psychological injuries, the trial judge summarized the plaintiff's testimony regarding this tragic portion of her life as follows:
"This Court's evaluation of Ms. Koury's psychological injuries is complicated by the fact that Ms. Koury suffered a great deal of psychological trauma throughout her life before the accident. Ms. Koury was born in Michigan, and was removed from her parents' custody at age three because her mother physically abused her. At that time, she was placed in a children's home until a foster family was able to be located. From age four (4) to age sixteen (16) Ms. Koury lived in approximately twenty (20) foster homes. According to her testimony, she was beaten quite severely in all but about three (3) of these foster homes. She also testified that she suffered sexual abuse at the hands of her half-sister, her half-brother-in-law, and several of the men in these families and their friends. Ms. Koury also stated that she was beaten with objects such as two-by-four's, rubber hoses, and razor straps. These beatings resulted in many injuries, including stitches, and a broken arm.
At age sixteen (16), Ms. Koury was raped, and required by the state of Michigan to have an abortion. Charges were dropped against the perpetrator because he was "a prominent citizen". At this age, she ran away from her last foster home and sought refuge with a black family in Michigan. Being white, she found her stay there difficult. Although she found this family relatively pleasant, she witnessed gambling, pimps and whores, and was subjected to sexual advances by men. She witnessed the killing of her boyfriend and was informed that a contract on her life had been let. She left this area to live with Dwight Cole. She became pregnant by Dwight Cole on two (2) occasions. The first resulted in a miscarriage due to a beating imposed by a traveling salesman. The second resulted in a miscarriage due to a beating by Dwight Cole who also broke her nose during that beating. She received no medical treatment for either of these miscarriages or beatings.
In 1979, Glenna Koury married William Koury, who beat her on a regular basis and forced her to use drugs, such as acid, speed, valium, and marijuana. Her husband also forced her to have sex with his friends. Ms. Koury left her husband and was on her own for a short period of time before moving to Louisiana. During this time she held several odd jobs and prostituted herself.
Upon moving to Louisiana, she worked at the Industrial Point Cafe where she met Lawrence Hendricks. She almost immediately moved in with Mr. Hendricks and lived with him in a converted bus. Ms. Koury was fired from her job at the Industrial Point Cafe. While pregnant with Jessica, two (2) of Mr. Hendricks' co-workers severely beat both Mr.

*739 Hendricks and Ms. Koury requiring Ms. Koury to go to the hospital. Five (5) months after Jessica Baker was born, the family decided to move to Texas. It was during this trip that the accident occurred."
As a result of his interview with plaintiff, Dr. Haynie summarized her mental condition as being moderately depressed. He could find nothing to indicate that she was psychotic or had organic brain impairment. He also found her believable and described her symptoms as fulfilling the criteria for what is called acute post traumatic stress disorder. He described this condition as a psychological reaction to a traumatic experience, which manifests itself in certain characteristic ways. Dr. Haynie stated there may be recurrent nightmares of the traumatic event and "numbing" which is a condition wherein one withdraws from interpersonal relationships and has very little interests in carrying on with one's life. The third major category of symptoms include a miscellaneous group of reactions like anxiety and panic when one is in a similar situation, such as where one was traumatized.
In April 1985, Dr. Haynie recommended psychotherapy, however, subsequent physicians at the center postponed psychotherapy and attempted chemotherapy instead in order to bring about some dramatic improvement. She was placed on antidepressants, but she did not seem to receive any benefit from them. Medication for anxiety was also prescribed which seemed to relieve her tension and anxiety. Dr. Haynie left the clinic in May 1985 to become program director of the Hammond Medical Mental Health Center. Plaintiff received treatment from other psychiatrists at the clinic until February 19, 1986. Dr. Pratt, who was the last doctor to see plaintiff at the clinic, returned to Dr. Haynie's original recommendation and suggested supportive psychotherapy. She was assigned this therapy on October 24, 1985.
After thoroughly reviewing the Slidell Mental Health Clinic records, Dr. Haynie indicated that at the time of his last examination of plaintiff, she was not mentally or psychologically capable of functioning at more than a rudimentary level, nor was she capable of employment in any capacity. He could not ascertain whether her condition had improved since his last examination; however, he felt her prognosis for recovery was fair because of her positive reaction to the anxiety medication. Given plaintiff's prior history, he was of the opinion that she was a likely candidate for someone becoming incapacitated if subjected to a major trauma like the automobile accident she experienced.
Plaintiff was also examined by a Dr. Kenneth A. Ritter on March 19, 1986, at the request of Lanier Express, Inc. When questioned about the accident, plaintiff told Dr. Ritter that she experienced nightmares about the accident and frequently experienced headaches. Dr. Ritter also noted that she complained about back pain and swelling in her ankles. Dr. Ritter stated that he could not make a definite diagnosis of post traumatic stress because plaintiff did not report other characteristic symptoms like flashbacks of the accident while awake or a phobia, usually in automobile collision cases, an avoidance of riding in a vehicle. However, the record does not reflect that she was even questioned about the latter complaints.
On September 18, 1986, plaintiff was examined by Dr. William P. Cloyd at the request of her counsel. Prior to his examination, he reviewed the deposition of Drs. Haynie and Ritter and the Slidell Mental Health Records and the pretrial memorandum on her injuries. Dr. Cloyd also diagnosed a chronic post traumatic stress disorder due to the accident superimposed on preexisting past episodic personality disorders. His overall impression of plaintiff was that she was truthful throughout the interview and was not a malingerer. He further stated that she needed further psychotherapy and medication. He estimated that the psychotherapy would cost anywhere between $510.00 to $4,080.00, but gave no estimate on the cost of the psychiatric medication.
After reviewing all of the medical testimony, the trial court favored the deposition *740 of Dr. Haynie over those of Drs. Cloyd or Ritter because Dr. Haynie was the only psychiatrist who was employed to treat plaintiff and not just to evaluate her injuries for the sake of litigation. We agree with this determination.
In his reasons for judgment, the trial judge concluded that although plaintiff was already psychologically unhealthy, her problem was moderately aggravated by the accident, and should resolve itself to its former condition. Based upon his interpretation of the evidence, the trial court awarded a lump sum of $10,000.00 for plaintiff's psychological injuries and future medical expenses.
We find that the evidence supports the trial judge's finding of fact relative to plaintiff's psychological and emotional condition; thus, we are of the opinion that the trial court's award of $10,000.00 was not an abuse of discretion and that it adequately compensated plaintiff for the aggravation of her prior psychological problems.
B. Award for Fractured Ankle
It is undisputed by the parties that plaintiff suffered a fracture of the left ankle in the accident. The only dispute between the parties relative to plaintiff's ankle concerns the origin of pain and swelling which she maintains continues to exist.
On the day of the accident, plaintiff was taken to University Medical Center emergency room where an operation was performed to insert a pin in her ankle. A cast was placed on her ankle and she was discharged two days later. The cast on her ankle was removed three weeks after the accident at Washington/St. Tammany Charity Hospital. The hospital records reflect that her ankle was still swollen and painful. When the cast was removed, she was referred to the New Orleans Charity Hospital and was seen there six times between November 29, 1984 and February 1, 1985 for her ankle. A second surgery was performed on May 1, 1985 to remove the pin in her ankle. She remained under treatment at Charity until May 9, 1985. After her discharge from Charity Hospital, she again wore a cast and was on crutches for two weeks.
At trial plaintiff testified that her ankle still swells and causes pain when she does heavy house cleaning or walks a lot. She described on one occasion that she was moving some bookcases into her living room and her foot gave out causing her to fall and the bookcase to land on her foot. She could not remember whether this was before or after the second operation to remove the pin. The injury to her ankle was serious enough to require medical treatment at Slidell Memorial Hospital. Plaintiff further testified that on another occasion, she again sought treatment at Slidell Memorial Hospital for an ankle sprain which resulted after her daughter fell on the top part of her foot.
Dr. Claude S. Williams, an orthopedic surgeon, saw plaintiff at the request of Lanier Express, Inc. on May 22, 1985. He determined she had a ten percent loss of motion of the ankle, but felt she could return to work. At the request of her attorney, plaintiff also was examined by Dr. Michael Heard on July 12, 1985 and February 20, 1986. He assigned a five percent disability rating of the foot, two percent of the body. Dr. Heard did not state whether plaintiff would develop any arthritis in the future, but he did note that she had not developed any arthritis some one year and one-half post-injury. He also noted that most people do not develop arthritis after having an ankle fracture and having the injury repaired properly.
In his reasons for judgment, the trial judge found that plaintiff's current pain is most probably due to the two subsequent ankle injuries that plaintiff has suffered since the accident. Based upon his analysis of the medical testimony, he compensated plaintiff $12,000.00 for the injury to her ankle. The trial court's finding was not manifestly erroneous, nor was the award an abuse of discretion.
C. Damages for Bowel Problems, Abdomen Pain, Deterioration of the Eye, Jaw and Temple Pain
At trial, plaintiff asserted that these problems manifested themselves subsequent *741 to the collision and that they were a direct result of the accident. The trial judge made no award for these items of damages based on his assessment that plaintiff failed to prove that these injuries resulted from the accident. We agree.
It is well settled that the burden of proving the existence of damages and a causal connection between them and an accident rest with the plaintiff. Such proof must be shown by a preponderance of the evidence, a mere possibility is insufficient. Wells v. Allstate Ins. Co., 510 So.2d 763 (La.App. 1 Cir.1987); Meyers v. Imperial Cas. Indem. Company, 451 So.2d 649 (La. App. 3 Cir.1984). The record reflects that plaintiff did not complain of any abdominal pain during her treatment in the University Medical Center. By nine days after her discharge, she was seen at Slidell Memorial Hospital for impacted bowels. Thereafter she was seen at the Northshore Regional Medical Center in July and January 1, 1986 for bloody stools. While we do not doubt that plaintiff experienced these problems, there was no medical evidence to relate the bowel and abdomen problems to the accident. After review of the medical depositions related to this medical condition, we hold that plaintiff was unable to prove by a preponderance of the evidence that these injuries were caused by the automobile accident.
Likewise plaintiff presented no evidence to link her vision problems with the accident. The only relevant testimony was plaintiff's mention that she had not had her eyes checked since 1979. The total lack of competent evidence concerning the eye complaints supports the trial judge's denial of this allegation of damages.
The evidence elicited during the trial indicates that plaintiff's injuries included broken teeth in addition to a broken ankle and head injuries. Plaintiff testified she started experiencing problems with her jaw approximately six months after the accident. On January 14, 1986, she sought treatment in New Orleans Charity Hospital where one tooth was extracted and pain medication was prescribed. Plaintiff maintains her jaw injuries resulted in a temporomandibular joint disfunction (TMJ). Plaintiff's TMJ syndrome was first diagnosed by Dr. Amaraneni at the Slidell Memorial Hospital on February 23, 1986; however, he opined that this diagnosis was questionable. He was also of the opinion that plaintiff's symptoms were likely to have been caused by a serious blow to her nose and face on December 15, 1985, which resulted in plaintiff's seeking medical attention at Northshore Medical Center. Dr. Vickie Sue Hebert examined plaintiff on May 23, 1985 after plaintiff presented herself at Slidell Memorial Hospital complaining of pain on the left side of her mouth. Dr. Hebert clearly indicated that plaintiff had a very poor dental hygiene, which included multiple cavities, broken teeth and teeth that were decayed down to the gum line. Dr. Hebert further testified that a person who has as many problems as plaintiff was bound to have an abnormality in the way her mouth closes, which is in fact one of the major contributing causes of TMJ.
In his reasons for judgment, the trial court found that in light of these facts, plaintiff failed to prove that this injury resulted from the accident in question and no award was made. We cannot say that the trial judge abused his discretion in failing to award any damages, or that his finding was clearly erroneous.
D. Damages for Headaches
It is undisputed that plaintiff received a concussion and lacerations requiring sutures to her forehead in the accident. She testified that she began suffering from headaches shortly thereafter. The medical evidence indicates that these headaches are probably related to the post-traumatic distress disorder. On November 1, 1985, plaintiff first visited Dr. Ricardo Garcia Rivera at New Orleans Charity Hospital where she sought treatment for her headaches. After a thorough examination the physician diagnosed the condition as post traumatic headaches. The record indicates that plaintiff suffered tension headaches prior to the accident and experienced several blows to the head pre-accident and post-accident. The court found that the accident *742 caused her to suffer additional headaches, but not to the extent claimed and awarded her damages in the sum of $1,500.00. Plaintiff failed to prove by a preponderance of the evidence that her headaches were solely the result of the accident. For these reasons the trial court's award of $1,500.00 for aggravation of prior headaches is more than generous and will not be modified on appeal.
E. Damages for Back and Neck Complaints
Since the accident plaintiff has received therapy for her back and neck complaints by two chiropractors, Dr. Anthony Kritko and Dr. Eddie Pulliam. Plaintiff initially sought treatment from Dr. Kritko who performed back adjustments twice a week for approximately four months. When Dr. Kritko moved his office, she visited Dr. Pulliam. The treatment and frequency of visits remained the same for several months before she discontinued treatments.
On July 22, 1985, Mrs. Koury was seen for her back and neck pains by Dr. Amarenni, an expert in emergency medicine, at Slidell Memorial Hospital. He diagnosed her injury as a mild cervical muscle strain related to the accident. The medical evidence reveals that plaintiff never complained of back or neck pain to any of the physicians who were treating her for other ailments in the months following February 1985. Dr. Vickie Hebert testified that although she examined plaintiff for numerous conditions, she never complained of back or neck problems on these visits. Likewise, Dr. Rivera testified that plaintiff did not complain of neck or back pain and in fact had no spasms in either of these locations during her visits to him. The trial court awarded plaintiff $2,000.00 after finding that plaintiff did sustain a possible mild cervical muscle strain to her neck but that all discomfort and pain had disappeared by February 1985.
Plaintiff maintains she has continued to suffer pain in her back and neck and the $2,000.00 is an inadequate award. While the award may be in the lower range, we cannot say it is so inadequate as to amount to an abuse of discretion even assuming plaintiff has continued to experience some discomfort after February 1985.
F. Award for Loss of Earning Capacity
The trial court summarized the facts relative to plaintiff's loss of earning ability as follows:
"This Court finds that plaintiff has failed to prove her claim for lost wages. She has worked sporadically during the last five (5) years in such jobs primarily as a waitress. She was fired from her last job as a waitress and did not seek further employment and was, in fact, unemployed and had been for sometime at the time of the accident. Although she testified that she has now sought employment but been refused because of the injury she alleges she suffered in the accident the Court does not accept this as the reason for her unemployment. On the contrary, the Court finds that she has been able to return to work for sometime. This was even suggested by the parents of Mr. Larry Hendricks with whom she lived for approximately six (6) months. There seems to be no medical reason why she could not return to the same type of employment that she held on those few occasions when she did work in the past. For these reasons the Court will deny this claim."
Loss of earning capacity is determined by deducting plaintiff's earning ability after the injury from her earning ability immediately prior to the injury rather than deducting her income after the injury from any income prior to the injury. Coco v. Winston Industries, Inc., supra; Gardiner v. Commercial Union Insurance, 488 So.2d 1331 (La.App. 3 Cir.1986). We are satisfied that the denial of this claim by the trial court was supported by the record. For this reason we will also deny this claim.
For the above reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[*] Judge Edmund M. Reggie, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.