536 So.2d 745 (1988)
Joseph Lee FRUGE, et al, Plaintiffs-Appellants,
v.
STATE of Louisiana, DEPT. OF TRANSPORTATION & DEVELOPMENT, et al, Defendants-Appellees.
No. 87-1050.
Court of Appeal of Louisiana, Third Circuit.
December 14, 1988.
Writ Denied February 24, 1989.
*746 Aaron Harris, Opelousas, for Fruge.
Watson, Murchison, Crews, Arthur & Corkern, William Crews, Jr., Natchitoches, for O. LaCour.
Gregory & Wright, R. Stuart Wright, Natchitoches, for N. LaCour.
Guglielmo, Lopez & Tuttle, John R. Walker, Opelousas, for defendant/appellant/appellee.
Domengeaux & Wright, Thomas R. Edwards, Opelousas, for defendant/appellee.
Before GUIDRY, FORET and KNOLL, JJ.
FORET, Judge.
This action results from a two-car collision which took place on September 25, 1983, at the Nuba intersection of La. 10 and U.S. 167. Mrs. Irma Fruge, driver of one vehicle, died as a result of the accident. This action was instituted by her husband, Joseph Lee Fruge, and her two sons, John M. Fruge and Anthony Joseph Fruge, against the State of Louisiana, through the *747 Department of Transportation & Development (DOTD); Olea D. LaCour, the driver of the other vehicle; and N.L. LaCour, a passenger in the LaCour vehicle. Also named as defendants were Commercial Union Insurance Company, the LaCours' insurer (later stipulated to be Employers Fire Insurance Company); and Lumbermen's Mutual Casualty Company, Fruge's insurer.
By separate actions, both Olea and N.L. LaCour brought actions against the Department of Transportation & Development. All actions were consolidated for trial. The trial court, in three separate judgments, dismissed all claims against the State of Louisiana, through the Department of Transportation & Development, finding Mrs. Olea LaCour 75% at fault in the accident and Mrs. Fruge 25% at fault. All plaintiffs appeal.[1] Separate opinions are being rendered this date in Olea D. LaCour v. State of Louisiana, Through Dept. of Transportation & Development, 536 So.2d 754 (La.App. 3rd Cir.1988) and in N.L. LaCour v. State of Louisiana, Through the Dept. of Transportation & Development 536 So.2d 755 (La.App. 3rd Cir.1988).

FACTS
The trial court, in excellent reasons for judgment, set forth the factual background of this case as follows:
"These suits, which were consolidated for trial, arise from an automobile accident which occurred at the intersection of U.S. Highway 167 and LA 10, locally known as the `Nuba Intersection,' at approximately 2:14 p.m., Sunday, September 25, 1983. LA 10 and U.S. 167 and the latter's extension, also known as the I-49 By-Pass, at the time of the accident were hard-surfaced two-lane highways. A railroad crossed the by-pass about 300 feet east of the intersection. The intersection was controlled by a beacon light, flashing red for traffic traveling east and west on U.S. 167 and its extension to I-49, and amber for north-bound and south-bound traffic on LA 10.
"Immediately prior to the collision, Mrs. Odea [sic] D. LaCour was driving the family car, a 1981 Ford Fairmont, on the U.S. 167 extension from I-49 to the Nuba intersection. Failing to observe and heed certain highway signs in place for west-bound traffic, as well as the red beacon light, she proceeded to cross the intersection and collided with a 1980 Ford Bronco automobile driven by Mrs. Irma D. Fruge, traveling south on LA 10 in the northwest quadrant of the intersection.
"Mrs. Fruge died instantly as a result of the accident. Mrs. LaCour suffered a broken hip and extensive lacerations. Her husband, [sicN.L.] M.N. LaCour, who was a passenger in the automobile, sustained a severe closed-head injury and other injuries which rendered him severely incapacitated and for which he will require twenty-four hour daily care for the remainder of his life."

ASSIGNMENTS OF ERROR
The following were assigned as errors on appeal by the Fruges. The LaCours join in assignment of error # 1 regarding the alleged negligence of the Louisiana Department of Transportation and Development.

I.
The Trial Court committed manifest error in absolving the Louisiana Department of Transportation and Development of any negligence contributing to the occurrence of the two-vehicle accident.

II.
The Trial Court committed manifest error in its apportionment of fault between the respective vehicle drivers, assessing the driver of the Fruge vehicle with twenty-five (25%) percent fault.

*748 III.
The Trial Court committed manifest error, and abused its discretion, in granting a grossly inadequate award to the surviving father and two children (one minor and one major), of the Fruge family.

LIABILITY OF DOTD
Both the Fruges and the LaCours contend that the trial court erred in absolving the DOTD of any negligence contributing to the cause of this accident.
We adopt the trial court's summary as to the allegations against DOTD as follows:
"[The Fruges] plead the negligence of the Department of Transportation and Development as follows:
`A. Failure to have an overpass at the intersection of LA 10 and U.S. 167.
B. Failure to have a signal light (red light) at the intersection of LA 10 and U.S. 167.
C. Failure to have ¼ mile caution lights near the intersection of LA 10 and U.S. 167.
D. Failure to have large stop signs at the intersection of LA 10 and U.S. 167.
E. Failure to have speed barriers or breakers on the highway near the intersection of LA 10 and U.S. 167.'
. . . .
"Answering the Fruge suit, the Department of Transportation and Development generally denied the allegations against it. As a third-party plaintiff, it sued Mr. and Mrs. LaCour and their insurer, alleging the sole negligence of Mrs. LaCour in causing the accident. It pleaded that in the event it was found guilty of any negligence regarding the accident, it was, in that case, entitled to full indemnity from the LaCours and their liability insurer, and alternatively they prayed for contribution from them as co-tort feasors in solido on a pro-rata basis.
"In their suits, Mr. and Mrs. LaCour contend that the accident and injuries were caused by the State of Louisiana, Department of Transportation and Development, in the following non-exclusive particulars, namely,
`A. In designing a defective intersection;
B. Failure to place a traffic control signal light (red light) at an intersection where the Department of Highways had prior knowledge of heavy congestion;
C. Failing to place speed barriers or breakers on the highway near the intersection;
D. In constructing an intersection in close proximity to a railroad crossing which confused motorists entering the intersection;
E. Improperly marking the intersection where a dominant highway leads into a lesser highway at an intersection making the lesser highway have the right-of-way;
F. Failing to install sufficient warning signs, warning approaching motorists of the intersection.'
"They further allege that the defective intersection which was in the sole custody of the Department of Transportation and Development, presented an unreasonable risk of harm to prudent drivers and that the defendant, the Department of Transportation and Development, had actual and constructive notice of these defects and failed to correct them within a reasonable time.
"Answering the LaCour suits, the Department of Transportation and Development generally denied their allegations and further pleaded contributory negligence and/or victim fault as a bar to Mrs. LaCour's recovery, as well as contributory negligence and assumption of risk as a bar to recovery by Mr. LaCour.
"By third-party petition, Mrs. LaCour, individually and as curator of N.L. LaCour and their liability insurer, alleging substantially the same acts of negligence pleaded by them against the Department of Transportation and Development, seeks indemnity and, alternatively, contribution from the Department of Transportation and Development should the LaCours and their insurer be cast in judgment in the Fruge case."

*749 DUTY
"It has been repeatedly stated that the Department is not a guarantor of the safety of travelers but, rather, owes a duty to keep the highways and its shoulders reasonably safe for non-negligent motorists.
. . . .
The duty to maintain reasonably safe highways and shoulders extends to the protection of those people who may be foreseeably placed in danger by an unreasonably dangerous condition."
Sinitiere v. Lavergne, 391 So.2d 821, 824, 825 (La.1980).
The duty imposed on the DOTD is the same under either strict liability or negligence. See, Entrevia v. Hood, 427 So.2d 1146 (La.1983).
"DOTD owes a duty to the traveling public to erect signs and markings to warn against extremely dangerous conditions or defects in the road. This is especially true where the situation is inherently dangerous or specifically required by statute. See LSA-R.S. 32:234; Ardoin v. State, Department of Highways, 333 So.2d 412 (La.App. 3rd Cir. 1976), cert. denied, 337 So.2d 214, 528 (La.1976). The duty extends to properly signing and marking highways to alert unwary drivers to unusually dangerous conditions, such as an unexpected, unmarked or improperly marked intersection. Wall v. American Employers Insurance Company, 215 So.2d 913 (La. App. 1st Cir.1968), writ denied, 217 So. 2d 415 (La.1969)."
Dartez v. Powell Oil Co., 499 So.2d 1046, 1047, 1048 (La.App. 3 Cir.1986).
"[T]he Department owes a duty to warn of hazardous conditions not only to prudent and attentive motorists, but also to those who are slightly exceeding the speed limit or who are momentarily inattentive."
Ledbetter v. State, Dept. of Transp. & Dev., 502 So.2d 1383, 1387 (La.1987).
"The test generally applied in determining what constitutes a dangerous hazard is whether the accident would have happened if a motorist was exercising ordinary care. Broussard v. Jefferson Parish, 375 So.2d 722 (La.App. 4th Cir.1979), writ denied, 377 So.2d 119 (La.1979)."
Dartez, supra, at page 1048.
"A motorist's duty of reasonable care includes the duty to keep his vehicle under control. Russo v. Guillory, 322 So. 2d 233 (La.App. 4th Cir.1975), writ denied 325 So.2d 608 (La.1976). Further, a motorist has a duty to maintain a proper lookout for hazards which by the use of ordinary care and observation he should be able to see in time to avoid running into them. Southern Farm Bureau Casualty Ins. Co. v. Gay, 276 So.2d 893 (La.App. 1st Cir.1973). This duty, at the very least, runs in favor of passengers riding in the motorist's vehicle as well as to those occupying other vehicles on the highway for the risk of harm associated with automobile accidents."
Sinitiere, supra, at page 826.
"Whether DOTD had breached this duty, that is, whether the roadway and shoulders at the scene of the accident were in an unreasonably dangerous condition will depend upon the particular facts and circumstances of each case."
Myers v. State Farm Mut. Aut. Ins. Co., 493 So.2d 1170, 1172 (La.1986).
In the instant case, the trial court summarized the evidence as follows:
"Officer Donald Simien, who investigated the accident, testified that there had been many wrecks at the intersection prior to the accident. He noted that the Department of Transportation and Development had had notice of the past accidents and had received recommendations that a `stop' light be installed at the intersection to replace the flashing beacon. On cross-examination he stated that a driver traveling west on the U.S. 167 extension towards the intersection had no trouble seeing the `stop' sign or seeing the red flashing beacon over the intersection. Because of the number of collisions at this intersection, it was his opinion that a red, yellow, and green traffic light would work better, since he had observed that drivers did not stop *750 for the red flashing light as they should have stopped.
"Further corroborating the frequency of the accidents at the intersection, Roland Lafleur, a retired state police officer stated that the intersection was more dangerous subsequent to September 8, 1983, when I-49 traffic was diverted through it. Before the construction of the 167 intersection from Nuba to I-49, that route was a parish gravel road.
"Mrs. LaCour indicated that she did not recall anything about her approach to the intersection. She remembers only that when she regained consciousness after the collision, she saw her husband lying on the road.
"Mary S. Coleman, a passenger in the Fruge Bronco, was not called to testify.
. . . .
"Larry Harry, a civil engineer and an expert in traffic engineering, who testified on behalf of the Department of Transportation and Development, stated that the flashing beacon could be seen at least 1500 feet away by a person with a 20% cone of satisfactory vision. He maintained that the intersection was non-complex and that, in his expert opinion, the controls at the intersection on the date of the accident were adequate. Too, he stated that the wide-throat intersection at Nuba met all the legal requirements of the road design manual, and that each hazard, namely, the railroad crossing and the subsequent stop at the intersection, was specifically dealt with by the signs. Mr. Harry stated that on the date of the accident a person driving west towards the Nuba intersection on the 167 extension, in addition to crossing the railroad some 300 feet east of the intersection, would or should have also seen an advance railroad crossing sign, a `stop ahead' sign, a junction sign, destination sign, and the large `stop' sign at the intersection.
"He stated that prior to the opening of the 167 extension, the intersection had more than the required signs `and that the accident record was not of the type which indicated the necessity of signalization.' Although a `stop' signal, intended to prevent right-angle collisions, was installed at the intersection sometime in November, 1983, after a traffic survey was performed by the Department, Mr. Harry's testimony indicates that during the subsequent year there was no significant decrease of these collisions.
. . . .
"S.C. Walker, an engineer and an expert in accident reconstruction, testified that his analysis of the case revealed that at the moment of impact the LaCour car was traveling between 21-26 miles per hour and the Ford Bronco between 49-55 miles per hour. He stated that it was possible the accident occurred because of Mrs. LaCour's driving confusion caused by the `railroad crossing ahead' sign east of the railroad and the `stop ahead' sign just west of the tracks, and that she may have concluded the `stop ahead' sign was to indicate the railroad crossing. Mr. Walker was otherwise unable to find any other specific relationship between the signs and the accident, but he maintained that additional signing was advised. In his opinion, the signs, although lawful, were inadequate, and they failed to provide the stimulus to tell Mrs. LaCour that the stop sign was there. His belief is that the lack of stimulus or the confusing stimuli caused the accident or contributed to its happening."
Additionally, on cross-examination, Mr. Walker testified that regardless of how much signalization is present, there are always going to be people who will purposely or accidently run stop signs. He continued by testifying that only a small percentage of persons will miss a single stop sign even if there is no advance warning. He continued by stating:
"So, most of the advance warning and most of the additional signing and signalization is directed to that very small percentage of drivers that need some additional stimulus and another stimulus if they missed the first stimulus. A repetitive stimuli is warranted."
In this case, there were flashing beacons, a "stop ahead" sign, and junction markers *751 in addition to the stop sign and other signs at the intersection. These warnings constituted additional stimuli and warning for that small percentage of drivers who will miss a single stop sign without advance warning.
"Compliance with the provisions of the manual is prima facie proof of a road authority's absence of fault when an injured motorist attempts to predicate the liability of the road authority on improper signalization or road marking. LSA-R.S. 32:235(E)."
Hatcher v. State Through Dept. of Transp., 467 So.2d 584, 587 (La.App. 3 Cir.1985).
Mr. Walker, plaintiffs' expert, testified that the installation of signs at the intersection was proper, but felt that the accident history indicated that there were not enough stimuli. Still, he could not analyze whether or not an active traffic signal would have been more effective than the flashing beacon which was in place.
As recently noted by our brethern in the First Circuit:
"We know of no jurisprudential presumption to the effect that had additional or different signals been used the driver would have obeyed them or that the failure of the state to provide additional or different signalization of the intersection is always the cause of an accident occurring at that intersection. See Kennison v. State, Department of Transportation & Development, 486 So.2d 267 (La. App.3d Cir.), writ denied, 489 So.2d 917 (La.1986); Vallot v. Touchet, 337 So.2d 687 (La.App.3d Cir.1976). After thoroughly reviewing the record we are unable to state that the accident would probably not have occurred but for the state's failure to provide additional signalization."
Burge v. City of Hammond, 509 So.2d 151, 157 (La.App. 1 Cir.1987), writ denied 513 So.2d 285 (La.1987).
We agree with the trial court's insight:
"Having considered the evidence and briefs of counsel, I find that plaintiffs have failed to prove that this unfortunate accident was caused in whole or in part by the fault or negligence of the Department of Transportation and Development. The intersection was not defective, nor did it present an unreasonable risk of harm to those persons traveling through it. As evidenced by the testimony and some of the photographs filed as Exhibit D-2, the signing was adequate and was not confusing to a driver traveling west on the U.S. 167 intersection, nor was there any obstruction which prevented drivers who approached the intersection a (sic) right angles from each other from seeing the other in time safely to avoid a collision should the necessity to stop be indicated.
"In my opinion, if she had been looking, Mrs. LaCour would have seen the `stop' sign and the red beacon, which were both in clear view. She could have easily stopped before entering the intersection, and it was her duty under LSA, R.S. 32:234(A)(1) to stop and not to attempt to cross the intersection unless she could do so in safety. Failing to stop, she proximately caused the accident."
Having ignored the signs already posted, we cannot say that additional signing or an activated traffic signal would have changed Mrs. Lacour's actions. Mrs. Fruge's death was not caused by the lack of additional warning signs or lack of an activated traffic signal, but instead by Mrs. Lacour's failure to stop at the intersection.
We therefore find that no act or failure to act on the part of DOTD was the cause-in-fact of Mrs. Fruge's death and the Lacours' injuries. The damages were caused by the fault of Mrs. Lacour and Mrs. Fruge's comparative negligence, which will be discussed below.

NEGLIGENCE OF FRUGE
The Fruges contend that the trial court erred in assessing Mrs. Irma Fruge with 25% of the fault contributing to the occurrence of the accident. The trial court stated:
"Mrs. Fruge also was negligent. She too had a clear view of the intersection and the flashing amber beacon. If she *752 had looked and not entered the intersection except with utmost caution as provided by LSA, R.S. 32:234(A)(2), she would have avoided the accident.
Thus, I find that Mrs. LaCour was 75% at fault in the accident and that Mrs. Fruge was 25% at fault."
Under La.R.S. 32:234, a person approaching a flashing amber light must proceed with caution through such signals. This standard of caution is set forth in Fontenot v. Shelter Mut. Ins. Co., 499 So.2d 997, 1000 (La.App. 3 Cir.1986), as follows:
"The standard of caution was set out in Great American Insurance Company v. Turnage, 339 So.2d 1322 (La.App. 1st Cir.1976), to-wit:
`A motorist who approaches an intersection controlled by a flashing yellow light is under a duty to exercise a greater degree of care and vigilance than one approaching a green light or an uncontrolled crossing. Pederson v. Schenck, La.App., 204 So.2d 316 (1st Cir.1967). The degree of caution required of a person approaching a flashing yellow light includes approaching at a reasonable speed and maintaining a proper lookout for danger. What constitutes a reasonable speed and a proper lookout depends on the facts of each case. Rogers v. Tiger, La.App. 305 So.2d 147 (1st Cir.1974); Insured Lloyds v. Liberty Mutual Insurance Co., 286 So.2d 420 (1st Cir.1973). While driver approaching a flashing yellow light may ordinarily rely on the fact that a driver approaching a flashing red light will stop before entering the intersection as required by law, the driver approaching the yellow light is under a duty to exercise caution and vigilance as he enters the intersection so that he may ascertain whether he can cross with safety. State Farm Mutual Automobile Ins. Co. v. Merritt [185 So.2d 832 (La.App. 3rd Cir. 1966)], supra; Savoy v. Cooley, 144 So.2d 223 (La.App. 1st Cir.1962).'
Furthermore, though the driver faced with the flashing yellow light may ordinarily rely on the motorist approaching the intersection on the inferior street stopping as required by the red flashing light if the evidence reflects such a motorist will not stop then the duty rests upon the driver on the favored street to avoid the accident if he can.' Savoy v. Cooley, 144 So.2d 223 (La.App. 1st Cir. 1962), cert. denied, and State Farm Mutual Automobile Insurance Company v. Merritt, supra."
The evidence disclosed that the Fruge vehicle was traveling between 49 to 55 miles per hour at the time of impact. The posted speed on the Washington Highway was 55 miles per hour. The LaCour vehicle was traveling at a speed of 21 to 26 miles per hour at the time of impact. A drawing of the accident scene submitted by plaintiffs in connection with the testimony of Officer Donald Simien depicted the LaCour vehicle more than halfway across the intersection at the time of impact. Under these circumstances, we cannot state that the trial court was clearly wrong in finding that Mrs. Fruge had a clear view of the intersection and, as such, there was no reason she would not have been able to see Mrs. LaCour approaching at a low rate of speed. Thus, we find no error in the trial court's finding that Mrs. Fruge was 25% at fault and Mrs. LaCour was 75% at fault.

QUANTUM
The Fruge family contends that the trial court committed error in awarding $100,000 to Joseph Lee Fruge for the loss of his wife and $35,000 to the two Fruge children. In addition to the above award for loss of love and affection, companionship and society, the trial court awarded Joseph Lee Fruge $82,500 for loss of support, earnings, and services, and $2,980 for funeral expenses. The Fruges claim that the trial court's quantum award was unconscionably low.
"LSA-C.C. Art. 2324.1 provides:
`In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.'
Before this court can disturb an award made by the trial court, the record must *753 clearly reveal that the trier of fact abused its discretion in making its award.
. . . .
Only after making such a finding can the appellate court disturb the award, then only to raise inadequate awards to the lowest amount the trial court could have reasonably awarded, or lowering excessive awards to the highest amount the trial court could have reasonably awarded" (citations omitted.)
Koury v. Lanier Exp., Inc. 528 So.2d 734, 737 (La.App. 3 Cir.1988).
As suggested by plaintiffs, we look to Thomas v. State Farm Ins. Co., 499 So.2d 562, 566 (La.App. 2 Cir.1986), writs denied, 501 So.2d 213, 215 (La.1987), for guidance, as follows:
"[A]wards for the wrongful death of a spouse range from $7,500.00 to $200,000.00, with $100,000.00 being the most frequent award closely followed by $150,000.00. In wrongful death cases involving a parent, awards to minor children have traditionally been greater than awards to major children. For example, awards to minor children range from $25,000.00 to $150,000.00, with most of those awards being at $40,000.00 and $100,000.00; awards to major children range from $20,000.00 to $75,000.00 with no specific concentration." (footnote omitted)
At the time of Mrs. Fruge's death, John Fruge was almost 20 and Anthony Fruge had just turned 17. We find that the awards for loss of love and affection, etc. to Joseph Lee Fruge of $100,000 and to John M. Fruge and Anthony J. Fruge of $35,000 each do not constitute an abuse of discretion by the trier of fact and are not manifestly erroneous and, as such, we will not disturb the trial court's awards.
In granting an award of $82,500 for loss of support, earnings, and services, the trial court's choice of award is higher than Dr. Boudreaux's analysis showing that the Fruge loss would be between $69,495.18 and $71,799.20. These figures included an amount by Dr. Boudreaux for loss of household services.
Conversely, the court's award of $82,500 for loss of support, earnings, and services is lower than plaintiffs' expert, Donald W. Cornwell's projection of loss of income[2] estimated at $94,198.90.[3]
The award of the trial court appears to be an average of the projections set forth by both parties' experts. We do not find that the trial court abused its discretion in awarding this amount.
Based upon the foregoing, the judgment of the trial court is affirmed. Costs of this appeal are to be divided equally between the LaCour and Fruge appellants.
AFFIRMED.
KNOLL, J., dissents and assigns written reasons.
KNOLL, Judge, concurring in part and dissenting in part.
I concur in that portion of the majority opinion in Joseph Lee Fruge v. State of Louisiana, Department of Transportation & Development, Olea D. LaCour v. State of Louisiana, Through the Department of Transportation & Development, 536 So.2d 754 (La.App. 3rd Cir.1988), and N.L. LaCour v. State of Louisiana, Through the Department of Transportation & Development, 536 So.2d 755 (La. App. 3rd Cir.1988), which found DOTD free from fault and affirmed the trial court's assessment of damages. However, I dissent from that part of the opinion in Fruge which affirmed the trial court's allocation of 25% fault to Mrs. Fruge.
*754 The question of Mrs. Fruge's fault was raised in the answer filed by Commercial Union, the liability insurer for the LaCours, and was not developed to any extent during trial. The only eyewitness to testify was Mrs. LaCour, and her testimony was that she had no recollection of the events surrounding the accident. The only testimony the trial court relied upon in its assessment of Mrs. Fruge's fault were the drawing attached to Officer Donald Simien's accident report, Officer Simien's photographs of the post-accident scene, and the testimony of the Fruges' accident reconstruction expert that Mrs. Fruge's speed was approximately 49-55 m.p.h. (the posted speed was 55 m.p.h.).
In his testimony, Officer Simien stated the cause of the accident in generalities, addressing no fault of Mrs. Fruge, and briefly described the scene as it appeared after the accident. Although Officer Simien's drawing of the accident scene was introduced into evidence, no detailed testimony was adduced about the particulars of the accident, i.e., how he arrived at the placement of the vehicles at the point of impact; who struck whom and where the vehicles impacted; and, had Mrs. Fruge tried to apply her brakes prior to impact.
Although the Fruges' accident reconstruction expert approximated vehicle speed, he stated that there were no skid marks for the LaCours' vehicle, and he was not questioned about the Fruges'.
I find that there is a paucity of evidence relative to Mrs. Fruge's fault, and conclude that the evidence which does appear does not preponderate that Mrs. Fruge failed to exercise caution and vigilance upon her approach to the caution light.
NOTES
[1] Appellants include Joseph Lee Fruge, John Anthony Fruge, John M. Fruge, Olea D. LaCour, individually and as curator of N.L. LaCour, Commercial Union Insurance Company, Employer's Fire Insurance Company, Olea D. LaCour and N.L. LaCour.
[2] This figure is based on pre-trial figures in addition to the median years to separation from the labor force (11.89 years).
[3] This figure does not include an award for loss of household services. Although the trial court's reasons for judgment do not articulate its basis, the trial court may have excluded an award for loss of household services based on plaintiffs' expert's calculations due to the fact that there was no evidence as to Mr. Fruge's hiring any household help. See, Lonthier v. Northwest Ins. Co., 497 So.2d 774 (La.App. 3 Cir.1986).