LABORDE, Judge.
Plaintiffs in this matter, David M. Broadway, individually and as the administrator of the estate of his minor son. Michael Paul Broadway, and Debra Broadway, filed suit against defendant, the State of Louisiana, through the Department of Transportation and Development (DOTD), for damages arising out of a vehicular accident. The accident occurred on U.S. Highway 171 between Zwolle and Many in Sabine Parish, Louisiana. After a trial on the merits, the trial court found in favor of defendant and against plaintiffs. Judgment was thereby rendered dismissing plaintiffs’ claims against defendant. Plaintiffs now lodge this appeal. We find no error in the judgment of the trial court. We affirm.
FACTS
On June 29, 1987, Debra Broadway and her then eleven year old son, Michael, were driving their 1986 Ford Bronco II in a southerly direction on U.S. Highway 171, heading towards Many, Louisiana. U.S. Highway 171 runs generally in a north/south direction. As originally constructed, it was a two-lane highway. In the late 1970’s, extra lanes were added to *778 both the northbound and southbound lanes. The function of these extra lanes is to allow motorists who are travelling at normal highway speeds to overtake and pass vehicles proceeding at slower speeds. The slower moving traffic is directed to proceed in the extra lane, which is the lane closest to the shoulder of the road. The extra lane for southbound traffic ascends a small hill and gradually merges with the normal lane of travel approximately 713 feet south of the crest. At this point, the normal lane and the extra lane converge so that the highway consists of two lanes again.
Although both Mrs. Broadway and her son were unable to recall the events surrounding the accident, two eyewitnesses provided this account. Mrs. Broadway was ascending the hill in her vehicle in the normal southbound lane of travel (the lane closest to the centerline) when she came upon a 1980 Ford LTD being driven by Ira Hudson. Mr. Hudson was proceeding in the same direction as Mrs. Broadway in the extra southbound lane. He testified that he was only travelling at about 35 miles per hour because he believed the breakdown of his car was imminent. Mr. Hudson also testified that as he reached the point where the lanes begin to converge, he observed the Broadway vehicle quickly approaching from the rear. As the two cars neared the convergence point, a tractor/trailer unit operated by Hubert Stevens approached from the opposite direction. Mr. Stevens testified that since it was apparent that Mrs. Broadway’s vehicle was being forced into his lane of travel, he brought his truck to a complete stop in the middle of the northbound lane. Mr. Stevens further stated that when Mrs. Broadway saw his truck in opposite lane, she slammed on her brakes and began skidding across the centerline into his lane of travel. Her vehicle continued to skid across the lane and left the road, where it hit a fence and began to flip. The truck eventually landed upside down on private property. Mrs. Broadway and her son suffered serious injuries as a result of the accident.
LIABILITY OF DOTD
On appeal, plaintiffs contend that the trial court committed manifest error in not finding that U.S. Highway 171, at the point where the accident occurred, was defectively designed. Plaintiffs argue that DOTD failed to implement minimum safety standards when it designed and constructed the passing lane configuration. In short, plaintiffs claim that the passing lane configuration presented an unreasonable risk to prudent drivers and was a cause in fact of the damage they sustained.
It is well-settled under Louisiana jurisprudence that DOTD is not responsible for every accident which may occur on a state highway, nor is it a guarantor of the safety of all travelers thereon. Generally, DOTD has a duty to construct and maintain highways in a condition reasonably safe for persons exercising ordinary care and reasonable prudence. United States Fidelity and Guaranty Company v. State, Department of Highways, 339 So.2d 780 (La.1976); Crochet v. Pritchard, 509 So.2d 501 (La.App. 3d Cir.1987); Beeson v. State, Through Department of Transportation and Development, 400 So.2d 278 (La.App. 3d Cir.), writ denied, 404 So.2d 1257 (La.1981). Plaintiffs in this case seek recovery under negligence or strict liability. Under a negligence or duty risk theory, DOTD will be held liable when the evidence shows that the condition complained of was patent or obviously presented an unreasonable risk to prudent drivers and DOTD had actual or constructive notice of the defect and failed to correct it within a reasonable time. Deville v. State, Through DOTD, 498 So.2d 1142 (La.App. 3d Cir.1986); Holt v. Singletary, 441 So.2d 330 (La.App. 5th Cir.1983). Under a strict liability theory, for a claimant to recover from DOTD he must show that the thing which caused the damage was (1) in the care and custody of DOTD; (2) it had a vice or defect which caused an unreasonable risk or injury to another; (3) the injury complained of was caused by the vice or defect. Holt, supra; Usry v. Louisiana Department of Highways, 402 So.2d 240 (La.App. 4th Cir.), writ denied, 404 So.2d 1259 (La.1981).
*779 To support their contention that the section of U.S. Highway 171 where the accident took place presented an unreasonable risk to prudent drivers, plaintiffs rely on the testimony of Robert Lipp. Mr. Lipp was accepted by the trial court as an expert in highway design and accident reconstruction. Mr. Lipp informed the court that in his opinion this particular section of the highway is unreasonably dangerous because at the merge point of the normal southbound lane and the extra southbound lane there is a sight line deficiency for southbound motorists with regard to oncoming traffic in the northbound lane. He explained that a sag in a hill located just south of the hill Mrs. Broadway crested obstructs the view that a motorist in the normal lane of southbound traffic has of traffic heading in the opposite direction. Mr. Lipp stated that the danger inherent in this situation is precisely that which Mrs. Broadway encountered, i.e. that a motorist in the normal lane of southbound travel can be forced to cross over into the northbound lane by a merging vehicle at a point where the motorist is unable to observe traffic approaching in the northbound lane.
Further testifying, Mr. Lipp opined that the dangerous situation created by this sight line deficiency could have been eliminated if DOTD had extended the passing lane another 200 feet. Had this extension been accomplished, traffic in the normal southbound lane would have had a full and unobstructed view of oncoming traffic. Mr. Lipp theorized that with the unobstructed view afforded by the extension, a motorist would be able to make a better informed decision whether to pass the merging vehicle or to slow down and let the merging traffic proceed ahead. He also pointed out that extending the passing lane would be in accordance with the minimum safety standards set out in the 1965 edition of The American Association of State Highway Officials: A Policy on Geometric Design of Rural Highways (the manual). In the section of the manual entitled “Climbing Lanes for 2-Lane Highways,” the following guidelines are provided for the merging of the normal lane and the extra lane:
“It is desirable to end the climbing lane at a point beyond the crest where a typical truck could attain a speed of about 30 mph. This may not be practicable in many instances because of the unduly long distance for trucks to accelerate to such a speed. A practical point for ending the added lane is one where the truck can return to the normal lane without hazard, in particular where the sight distance is sufficient to permit passing with safety when there is no on-coming traffic; or, preferably, at least 200 feet beyond this point. In addition, a corresponding length of taper should be provided to permit the truck to return to the normal lane. For example, on a high speed highway where the safe passing sight distance becomes available 100 feet beyond the crest the truck lane should extend 100 feet plus 200 feet or 300 feet, beyond the crest, plus an additional taper of at least 200 feet.”
Mr. Lipp testified that extending the extra lane another 200 feet would have brought the highway in compliance with the manual and would not have amounted to any more expense for DOTD.
On cross-examination, Mr. Lipp estimated that Mrs. Broadway was travelling 30 miles per hour faster than Mr. Hudson’s vehicle, which would put her speed at 65 miles per hour. Mr. Lipp explained that at this speed, Mrs. Broadway could have reduced the speed of her vehicle to equal the speed of the Hudson vehicle in a distance of 143 feet. Mr. Lipp further indicated that if Mrs. Broadway would have reduced her speed at the point where she should have realized that the passing lane was ending, it would have been possible for Mr. Hudson to merge in front of her safely.
DOTD offered its own expert witness at the trial of this matter. Dr. William O. Hadley was tendered and accepted as an expert in highway design, traffic engineering and accident reconstruction. Although Dr. Hadley conceded that a southbound motorist has insufficient sight distance where the lanes begin to merge, he did not consider this to be a design defect and did not consider the passing lane configuration *780 to be unreasonably dangerous. Dr. Hadley stated that a motorist’s view of oncoming traffic is obstructed for a brief distance, but that this sight line deficiency is clearly indicated by the double yellow center line which prohibits passing at this point. Dr. Hadley found no deviation from the guidelines set out in the manual. He also pointed out that a motorist is adequately informed of the fact that the extra lane is ending by a sign posted 1736 feet before the closure which states “Right Lane Ends” and by a sign posted 736 feet before the closure which establishes geometrically that the lane is about to end. Finally, Dr. Hadley opined that to extend the extra lane 200 feet south as suggested by Mr. Lipp would create an unreasonably dangerous situation, since a southbound motorist would not be able to view the commencement of the lane closure because of the slope of the hill.
After careful consideration of the record, we cannot say that the trial court erred in finding that the passing lane configuration of U.S. Highway 171 did not present an unreasonable risk of harm to prudent drivers. The evidence establishes that the right lane merge is adequately brought to the attention of motorists by road signs placed 1736 feet and 736 feet before the closure. While there does appear to be a sight line deficiency at the closure of the two lanes, we find that a motorist is sufficiently warned of this fact by the double yellow centerline which prohibits passing at this point. Regarding the issue of DOTD’s adherence to the manual in the design of this passing lane configuration, there is a divergence of opinion among the experts presented at trial. Plaintiffs’ expert testified that in his opinion the passing lane configuration did not conform with the specifications of the manual, while DOTD’s expert found it to be in compliance with the manual. A close reading of the pertinent section of the manual indicates to this court that its specifications for ending extra lanes are merely suggestions to be implemented if and when possible. We find that DOTD adequately complied with the specifications of the manual to the extent possible. This is especially so in light of Dr. Hadley’s testimony that to extend the extra lane 200 feet south would have presented a more dangerous situation because motorists would not be able to see the beginning of the lane closure.
We also agree with the trial court’s determination that Mrs. Broadway was solely at fault for the occurrence of the accident. The evidence indicates that Mrs. Broadway was well aware that the right lane merged with her lane, as she testified that she travelled this route often. The evidence further suggests that Mrs. Broadway could have reduced her speed and allowed Mr. Hudson to merge in front of her, but, instead, she attempted to beat him to the point where lanes merge. In her attempt to pass Mr. Hudson, she exceeded the speed limit by approximately 10 miles per hour. As a result of her haste to overtake the Hudson vehicle, Mrs. Broadway placed herself in a position of imminent peril. We conclude that a reasonably prudent driver would have observed that passing at the point where the lanes begin to merge is prohibited and would have reduced his speed to allow the vehicle in the extra lane to merge ahead. Mrs. Broadway’s actions in trying to overtake Mr. Hudson’s vehicle at a high rate of speed and then slamming on her brakes when she saw the oncoming traffic cannot be described as being reasonable under the circumstances.
As an alternative argument, plaintiffs claim that the sudden emergency doctrine should operate in this case to relieve Mrs. Broadway from all responsibility for the accident. The Louisiana Supreme Court in Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385, 389 (1972), described the sudden emergency doctrine in the following terms:
“One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a bet *781 ter method, unless the emergency in which he finds himself is brought about by his own negligence.”
The sudden emergency doctrine cannot be invoked by one who has created the emergency by his own wrong or has not used due care to avoid it. In other words, the doctrine does not lower the standard of care required of a motorist before an emergency occurs. Dick v. Phillips, 253 La. 366, 218 So.2d 299 (1969); Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3d Cir.1981). Since it is clear that Mrs. Broadway created the emergency situation herself, as a consequence of her negligence, the sudden emergency doctrine has no application in this case.
Finding plaintiffs’ arguments on appeal to lack merit, we affirm the judgment of the trial court. Plaintiffs are cast for all costs.
AFFIRMED.