590 So.2d 657 (1991)
Danny Frank COOKE, et al., Plaintiffs-Appellees,
v.
The TRAVELERS INSURANCE COMPANY, et al., Defendants-Appellants.
No. 90-501.
Court of Appeal of Louisiana, Third Circuit.
November 13, 1991.
Writ Denied January 31, 1992.
*658 Boagni, Hebert & Carriere, Donald Hebert, Opelousas, for plaintiff/appellee.
Olivier & Brinkhaus, John L. Olivier, Sunset, for defendant/appellant.
Before GUIDRY, DOUCET and KNOLL, JJ.
GUIDRY, Judge.
This case stems from an automobile accident which occurred on June 18, 1987 at the intersection of Louisiana Highway 182 and Heather Drive just south of Opelousas, Louisiana. Highway 182 runs in a generally north-south direction and Heather Drive runs in an east-west direction. A "T" intersection is formed at the point where Heather Drive intersects Highway 182 on its east side. Traffic at the intersection is controlled by a red-amber-green traffic signal, with a left-turn lane on Highway 182 just north of the intersection to allow separate access to Heather Drive for automobiles traveling in a southerly direction on Highway 182. The traffic signal was installed by the Department of Transportation and Development (DOTD) approximately one week before the accident. The speed limit through the intersection is 55 mph.
On the date of the accident, at approximately 11:45 a.m., Michael Deranger was traveling north on Highway 182. Three automobiles were stopped at the red light ahead of him, the third of which was being driven by Julia Elter. Deranger, apparently not seeing that the light was red for northbound traffic nor that the three vehicles were stopped ahead of him in obedience to the traffic signal, rear-ended the left side of the Elter vehicle and crossed over a yellow-lined neutral area into the oncoming southbound lane of traffic on Highway 182. He collided with a southbound automobile driven by Gwendolyn Cooke in which her two daughters, April and Sarah, were passengers. Gwendolyn had proceeded through the intersection under a green light for southbound traffic. The point of impact was south of the intersection and within 100 feet thereof. As a result of the collision, the Cooke vehicle flipped several times and Gwendolyn and Sarah were thrown from the vehicle. Gwendolyn died from injuries received in the accident. Her two daughters survived but were also injured.
Danny Frank Cooke, the divorced husband of Gwendolyn Cooke, filed suit as the legal tutor of April and Sarah seeking damages for their personal injuries and for the loss of love, affection, parental guidance, society, and support because of the death of their mother. Felix O. Pavy joined in the petition as administrator of the succession of Gwendolyn Cooke. Named as defendants were Travelers Insurance Company, the liability insurer of Michael Deranger, Michael Deranger, The Department of Transportation and Development, State of Louisiana (DOTD), the St. Landry Parish Police Jury and the City of Opelousas. All *659 defendants timely answered the petition and asserted third party demands and cross claims against each other. Summary judgment was subsequently granted in favor of the St. Landry Parish Police Jury and the City of Opelousas. Prior to trial, plaintiffs settled with Travelers and Deranger filed a petition for relief under Chapter 7 of the Bankruptcy Code of the United States. He then moved to stay the proceedings in this case based on the operation of the Bankruptcy Code's automatic stay provision. The automatic stay was subsequently lifted by the United States Bankruptcy Court, Western District of Louisiana, for the sole purpose of determining the liability attributable to Deranger in this particular case. Thus, in effect, this case proceeded to trial with only one of the originally named defendants, DOTD, remaining in the suit.
Plaintiffs urged at trial that DOTD was negligent in installing the traffic control device at the intersection which they characterized as unsafe, dangerous and hazardous. Plaintiffs asserted that, in installing the signal light, DOTD knew or should have known that it would cause the rate of rear-end collisions to increase. Further, plaintiffs urged that DOTD failed to warn the motoring public in an adequate manner of this dangerous condition. In addition, they argued that DOTD was negligent since it did not lower the speed limit on Highway 182 when it installed the traffic signal. DOTD denied that it was negligent in installing and maintaining the traffic signal at this intersection. In support of its defense, DOTD asserted that it installed safety features and warning devices beyond that which is required for this type of intersection by the Manual on Uniform Traffic Control Devices (the manual).
The trial court, in oral reasons for judgment, concluded that DOTD was negligent since it created an unreasonable risk of harm when it undertook signalization at the intersection. The court reasoned that DOTD "has an affirmative duty to do something to prevent these accidents [rear-end collisions] from happening". This duty, the court found, was imposed because DOTD knew that, by installing this signal light, accidents of this type were certain to increase. The trial court opined that DOTD did not do enough to protect those persons, i.e., Deranger, who do not see the signal light because they have conditioned themselves to see something completely different. Specifically, fault was assigned to DOTD because it relied on the manual too much as a substitute for prudent engineering practices.
In apportioning fault, the trial court found that Deranger was 40% at fault and DOTD was 60% at fault in causing this accident. In doing so, it ruled that Deranger's fault was due to his "inadvertence" and that DOTD's fault was due to its failure to adequately warn Deranger despite its superior knowledge of the intersection derived through engineering studies and traffic planning surveys. By judgment signed November 13, 1989, the trial court held DOTD liable to Danny Cooke as tutor of April Cooke for $276,401.95, to Danny Cooke as tutor of Sarah Cooke for $267,115.15, and to Felix O. Pavy, as the administrator of the succession of Gwendolyn Cooke, for $12,553.03.
DOTD appeals and assigns error in the trial court's judgment finding DOTD liable to the plaintiffs when it had properly installed the traffic signal and took safety measures to warn the motoring public over and above the precautions which are recommended in the manual. Plaintiffs answered the appeal and asserted error in the amounts awarded by the trial court to April and Sarah Cooke. They urge that the awards for loss of support should be increased by $50,000 and $75,000, respectively.
For the following reasons, we reverse, finding that the trial court was clearly wrong in its determination that DOTD was guilty of negligence which was a cause in fact of the accident. Accordingly, the issues of insufficiency of the loss of support awards raised by the plaintiffs in their answer to this appeal are moot.
Deranger testified that, at the time of the accident, he was employed as a driller by Henley Drilling Company. He was working on a drilling rig at Avery Island *660 on an eight days on, four days off schedule. He worked a 12-hour shift from 5:30 p.m. to 5:30 a.m. Deranger stated that on June 17, 1987, he awoke at approximately 2:30 p.m. at his home on Highway 182 approximately one-half mile north of the intersection in question. He later drove to Lafayette to pick up a co-worker, Greg Leger, enroute to the final night of this particular eight night rotation. In doing so, he did not pass through the Highway 182-Heather Drive intersection but instead chose an alternate route. However, he did state that a few days earlier he had noticed the signal light was installed and was flashing amber.
The men worked the entire 12 hours on the rig "tripping pipe", which appears from the record to be arduous manual labor. At 5:30 a.m., Deranger and Leger left the rig and stopped at a store. Each man bought a six-pack of beer and a bag of chips, then went fishing in a roadside pit between Avery Island and Lafayette until about 10:15 a.m. Deranger drank six beers during the morning. After he dropped off Leger in Lafayette, Deranger proceeded to his home in Opelousas. He stated that he did not see the traffic signal as he approached the intersection, although he had noticed it flashing caution amber earlier in the week. He saw vehicles ahead of him heading in a northerly direction, but did not expect that they would come to a complete stop at the intersection. Deranger also stated that he did not see the diamond-shaped yellow "SIGNAL AHEAD" warning sign placed on the northbound shoulder of Highway 182 approximately 434 feet from the signal light. He also stated that, by the time he saw the brake lights on the Elter vehicle and realized that it was stopped, it was too late to avoid the collision. He slammed on his brakes and his pickup truck swerved to the left. He had no recollection of any events which occurred after he struck the Elter vehicle. Deranger admitted that he was tired and sleepy. A breath test performed by the state police after the accident revealed that Deranger had a blood alcohol level of 0.11. Prior to the trial, all parties stipulated to the correctness of this fact and the stipulation was admitted into evidence.
The defendant DOTD's district traffic operations engineer, Lawrence Harry, testified on behalf of DOTD. He stated that before a change in signage is approved for an intersection, several studies designed to determine whether the change is warranted must be conducted. The results of these studies must be submitted to DOTD's Traffic Planning Division in Baton Rouge. The change must be approved by the DOTD's chief engineer before it can be implemented. Harry stated that separate studies to determine the feasibility of a flashing beacon were conducted in 1982 and 1984. Each study concluded that a flashing beacon was not warranted at the time. The 1984 study results recommended that a "T" intersection warning sign be installed. This was accomplished shortly thereafter. In 1985, the City of Opelousas and Representative Sal Diesi requested that a signal light be placed at the intersection due to an increasing number of accidents. In 1986, Harry conducted a traffic count study, a speed study, a sight distance study, an accident analysis and an engineering observation. The results revealed that the 85-percentile speed was 53 miles per hour, i.e., that 85% of the motoring public traveled through the intersection at 53 mph or less, and that the signal light would be visible from 1200 feet as a motorist comes out of a curve south of the intersection. In addition, the signal would also be within the driver's ten-degree "cone of vision" at 1200 feet. The manual requires visibility of the traffic signal at 625 feet. The study revealed that a full function traffic signal light was warranted due to the volume of traffic at the intersection and the need to alleviate congestion. The signal installed is both "clear" and "conspicuous" at 625 feet according to Harry.
After getting approval from DOTD in Baton Rouge, Harry installed oversized 12" signal lenses instead of the standard eight inch lens, as recommended by the manual. He also extended the amber time frame to help avoid rear-end collisions. A yellow "SIGNAL AHEAD" warning sign was installed on the shoulder next to the north *661 bound lane with a 30 inch depiction of a red-amber-green signal thereon. This sign was erected 434 feet from the intersection. The manual stated that, if such a warning sign was installed, it should be 450 feet from the intersection. This length can be varied within 75 feet depending on the road and visibility conditions. Harry emphasized that the large lenses, the increased amber time frame, and the warning sign were not required by the manual for this situation. When asked on cross-examination why more warning signs were not used, Harry responded that "overflooding the motorist with warning signs" is not a good practice since they "tend to lose effectiveness at some point". These devices were installed by DOTD as "an extra precautionary measure". In addition, Harry also put in a left-turn lane for motorists traveling southbound on Highway 182 to better facilitate a left turn onto Heather Drive. Although not required, this was also implemented to help traffic flow southward and to lessen the chance of rear-end collisions involving drivers wanting to turn left onto Heather Drive. On the south side, he put in a yellow-lined neutral zone which stretched southward for 330 feet between the lanes. This too met the manual's specifications for width and length. As is customary, DOTD then began operation of the signal in a flashing amber mode for a few days in order to alert the public to the fact that the signal light would go into full operation soon afterwards.
On cross-examination, Harry admitted that rear-end collisions increase when a traffic light is installed and that he was aware of this phenomenon when he installed the signal in question. However, he did state that most signal lights are installed to alleviate the incidences of right-angle collisions. In doing so, traffic engineers realize that they are increasing the probability that rear-end collisions will occur. The decision is usually made based partly on the fact that, normally, more serious injuries occur in right angle collisions than in rear-end collisions. It is apparent from the record that, generally speaking, all traffic engineers are aware of the fact that the probability that rear-end collisions may occur will increase when a traffic signal light is installed.
Robert Canfield testified on behalf of the plaintiffs as an expert in the fields of civil engineering and traffic control. At the time of the hearing, Canfield was employed by the East Baton Rouge City-Parish Metro Government as its traffic coordinator. While conceding that DOTD complied with the manual and provided more safety features than what was recommended therein, Canfield stated that DOTD should have gone further to provide even more warning signs. He suggested that an overhead "SIGNAL AHEAD" cantilever-type sign should have been used. Canfield also stated that DOTD should have been as concerned with "conspiciuty" (ability to recognize the fact that the signal is there) as it was with "visibility" of the traffic light (ability to see the signal when looking for the signal). To this end, it was his opinion that a yellow signal light housing should have been utilized to better contrast with a background of green trees instead of the standard green housing which was actually used by DOTD. The department should also have considered lowering the speed limit since the signal is approximately 1000-1200 feet from a curve with an advisory speed of 40 mph and, after the signal, the speed limit decreases to 50 mph. In addition, Canfiled stated that DOTD should have gone beyond its established procedures in inquiring about accidents by asking the Opelousas Police Department and Representative Diesi to identify which accidents they were referring to in their respective requests for a signal light.
Canfield opined that DOTD did not use reasonable care to warn Deranger, whom he classified as an occasional motorist "who gets accustomed to driving the road and drives it more out of reflex possibly than he does out of the devices that are on the road itself; ... he thinks he knows the road because he drove it a few days ago". It is this type of driver that the engineers should be most concerned with when they undertake to change the signage of an intersection. Canfield also contended that the taper length of the yellow lined neutral *662 zone separating lanes on Highway 182 on the southside of the intersection was too short. If it had been longer and thus wider south of the intersection, it could possibly have provided Deranger with an escape zone such that he would not have crossed into southbound traffic.
On cross-examination, Canfield admitted that if a motorist is traveling 55 mph as he comes out of the curve in the northbound lane and sees the light, he has ample time to stop. He also conceded, as Harry had previously stated, that a motorist traveling 55 mph needs a total of approximately 450 feet to be able to come to a complete stop. This figure includes reaction time as well as braking time. He also agreed that the "SIGNAL AHEAD" warning sign was not required and that, if the sign is not required, the flashing yellow warning light placed on the sign, which was not functioning at the time of the accident, was also not required. In addition, he admitted that driver fatigue is a contributory factor to motorists not noticing signal lights.
It is well settled in this state and has been routinely stated in cases of this nature that DOTD's duty to travelers is to keep the highways and their shoulders in a reasonably safe condition. Whether DOTD has breached its duty in this regard depends upon the facts and circumstances of each case. Myers v. State Farm Mutual Automobile Insurance Company, 493 So.2d 1170, 1172 (La.1986). DOTD is not responsible for all accidents occurring on state highways. It does not act as a guarantor of the safety of persons traveling on state highways, nor does it serve as an insurer of all injuries resulting from obstructions or defects thereon. Generally, DOTD has a duty to construct and maintain state highways in a condition which is reasonably safe for persons exercising ordinary care and reasonable prudence. United States Fidelity and Guaranty Company v. State, Department of Highways, 339 So.2d 780, 785 (La.1976); Burge v. City of Hammond, 509 So.2d 151, 156 (La.App. 1st Cir.1987), writ denied, 513 So.2d 285 (La. 1987). In addition, included within the general duty stated above is the specific duty to properly sign and mark highways to alert unwary drivers to unusually dangerous conditions, such as unexpected, unmarked or improperly marked intersections. Fruge v. Department of Transportation and Development, 536 So.2d 745, 749 (La.App. 3rd Cir.1988), writ denied, 538 So.2d 593 (La.1989), citing Dartez v. Powell Oil Company, 499 So.2d 1046, 1048 (La. App. 3rd Cir.1986). Its duty to warn of hazardous conditions extends "not only to prudent and attentive motorists, but also to those ... who are momentarily inattentive". Ledbetter v. State, Department of Transportation and Development, 502 So.2d 1383, 1387 (La.1987), Fruge, supra.
In this case, plaintiffs seek recovery based on the theory that DOTD was negligent in installing this traffic signal light. Under a negligence theory, "DOTD will be held liable when the evidence shows that (1) the condition complained of was patent or obviously presented an unreasonable risk of harm to prudent drivers; and, (2) DOTD had actual or constructive notice of the defect and failed to correct it within a reasonable time". La.C.C. art. 2315; Broadway v. State, Department of Transportation and Development, 567 So.2d 776, 778 (La.App. 3rd Cir.1990). In this case, this determination must be made in light of La.R.S. 32:235(E) which provides as follows:
"Proof that any state, parochial or municipal authority was at the time of any incident complained of in compliance with the provisions of the department's traffic control devices manual shall be prima facie evidence of discharge by such authority of its obligations to the motoring public."
See Hatcher v. State, Through Department of Transportation and Development, 467 So.2d 584, 587 (La.App. 3rd Cir. 1985). Where inadequate or improper signalization of an intersection creates an unusually hazardous risk to a driver exercising ordinary care and prudence, DOTD may be liable for damage caused by that hazardous condition. Bridges v. State, Department of Transportation and Development, *663 551 So.2d 810, 812 (La.App. 3rd Cir. 1989).
Finally, a motorist is under a duty to act as a reasonable and prudent person would under like circumstances. The highway driver "is charged with keeping a proper lookout, seeing what he should see, maintaining proper control of his vehicle and observing traffic signs". Darbonne v. State Farm Mutual Automobile Insurance Company, 408 So.2d 300, 306 (La. App. 3rd Cir.1981).
The record in the case sub judice reveals that DOTD undertook to install a traffic signal at the intersection after requests from local officials and after traffic control and site studies revealed the necessity therefor.
The manual adopted by DOTD contains standards promulgated by the Federal Highway Administration. Although not binding upon DOTD as substantive law, it is persuasive as to the method of designing and signaling intersections. The signal installed at the intersection in question was not only in total compliance with the manual, but it exceeded the recommendations of the manual. As such, this provides strong prima facie proof of the discharge of DOTD's obligations and duties to the motoring public pursuant to La.R.S. 32:235(E), supra. While not conclusive of the discharge of DOTD's duty, this presumption was apparently not considered by the trial judge when he found that, although DOTD had more than complied with the manual, the department was at fault for relying on the manual too much and using it as a substitute for prudent engineering, i.e., failure to provide adequate warning to inattentive motorists.
It is clear that the intersection as designed by DOTD did not present an unreasonable risk of harm to prudent drivers. The signal was clearly visible to approaching motorists for a distance of at least 1200 feet. A signal ahead sign was posted in advance of the intersection at a distance recommended by the manual. The trial judge apparently chose to believe Canfield's expert testimony as to his opinion that the installation of the traffic signal with a single warning sign created an unreasonable risk which was a contributing factor to this accident. However, Harry's testimony as to the method of his studies and the actual installation clearly reveals that the DOTD took adequate and prudent steps to ensure the safety of the motoring public.
Deranger could give no reason why he did not see the "SIGNAL AHEAD" warning sign, the signal light, or the three cars stopped at the signal light in front of him until it was too late. In addition, Deranger was not simply "inadvertent" or inattentive as characterized by the trial court. This was a man who had been awake for approximately 21 hours and had performed hard manual labor for 12 of those hours. He also drank six beers after work while fishing and he was legally intoxicated at the time of the accident. Admittedly, he was tired and sleepy. Thus, Deranger breached his duties as a motorist as enunciated in Darbonne, supra. This breach of duty was not caused by his inadvertence but resulted from his actions of drinking and driving after a long night of work. It is nothing but rank speculation to suggest that, had DOTD done more in the way of designing the intersection or warning the motoring public, Deranger would have seen the warning sign, the signal light and the three cars stopped at the light in front of him in time to avoid the accident.
In our view, the apparent acceptance by the trial court of Canfield's opinion that the installation of the traffic signal and the warning signs, in someway deviated from prudent traffic engineering considerations and created an unusually hazardous risk to a driver exercising ordinary care and prudence, was clear error. The record reveals no sound basis for this opinion which is totally at odds with the site studies conducted by the DOTD and the uncontradicted evidence that the traffic control installation not only complied with the traffic control manual but, in many respects, exceeded its requirements in the interest of safety. DOTD's undertaking to install a traffic signal at this intersection which far exceeded the manual requirements was not a *664 cause in fact of this accident. The sole cause in fact and thus, the legal cause of the collision was the negligence of Deranger. The trial court was clearly wrong in assessing fault against DOTD.
For these reasons, we reverse the judgment of the trial court and order plaintiffs' suit against the State of Louisiana, Department of Transportation and Development, dismissed with prejudice and at plaintiffs-appellees' cost.
REVERSED AND RENDERED.