619 So.2d 1149 (1993)
Monroe S. RICK, Sr., Monroe S. Rick, Jr., Michael E. Rick, Martha Rick Anthony, Melinda Rick Howes
v.
STATE of Louisiana, THROUGH The DEPARTMENT of TRANSPORTATION AND DEVELOPMENT.
No. 92 CA 1000.
Court of Appeal of Louisiana, First Circuit.
May 28, 1993.
Concurring Opinion June 1, 1993.
*1151 Paul Due, Baton Rouge, Joseph Simpson, Amite, Grace Gasaway, Hammond, for plaintiff-appellee.
Duncan S. Kemp, III, Hammond, for defendant-appellant.
Before WATKINS, CRAIN and GONZALES, JJ.
Concurring Opinion of Judge Gonzales June 1, 1993.
CRAIN, Judge.
This is an appeal from a judgment in a personal injury action.
On July 20, 1988, at approximately 1:43 p.m. Mrs. Mary Rick was driving a Volkswagen Rabbit in a westerly direction on Minnesota Park Road (MPR) which is located in the vicinity of the City of Hammond. MPR runs on an east-west direction. A railroad grade crossing owned by Illinois Central Railroad Company (ICRC) intersects with MPR. At the time of the accident, the crossing consisted of two sets of tracks which ran in a north-south direction.[1] The railroad grade crossing at issue was signed by an advance warning sign, a cross buck, and a red and white stop sign. As Mrs. Rick approached the grade crossing she stopped at the stop sign then proceeded slowly across the tracks. For some reason her vehicle stopped on the tracks and shortly thereafter was struck from the right by a southbound passenger train owned and operated by the National Passenger Railroad Corporation commonly known as Amtrak. Mrs. Rick died as a result of the accident.
Mrs. Rick's husband and four of her major children instituted this action against the state through the Department of Transportation and Development (DOTD). DOTD subsequently filed a petition entitled "cross claim" against Amtrak and the City of Hammond seeking indemnity and/or contribution. Amtrak filed a motion for summary judgment against DOTD in the "cross claim" or third party action contending that it was uncontroverted that Amtrak had previously entered into a compromise with plaintiffs in the principal action as a result of which Amtrak had obtained an *1152 unconditional release and discharge from plaintiffs. Summary judgment was rendered in favor of third party defendant Amtrak and against DOTD.
The City of Hammond as third party defendant filed the peremptory exception raising the objections of no cause and no right of action. The city also filed a motion for summary judgment on the basis that the grade crossing was outside the city limits in that the city was bounded on the east by the west right of way line of the ICRC. Summary judgment was rendered in favor of the city.
DOTD also filed a third party action seeking indemnity and/or contribution against the ICRC. ICRC answered, pleading release and discharge by plaintiffs in the principal action. ICRC subsequently filed a motion for summary judgment after which DOTD filed a motion for order of voluntary dismissal of ICRC which was granted by the court.
We note that DOTD has not appealed the summary judgments dismissing the City of Hammond and Amtrak. In brief DOTD contends MPR is a parish road; however, the Parish of Tangipahoa was not made a party either to the principal or third party demand.
After a bench trial on the merits, judgment was rendered in favor of plaintiffs and against DOTD. In written reasons for judgment the trial judge found both Mrs. Rick and DOTD at fault and apportioned 50% comparative fault to each. Judgment was entered in conformity with the written reasons.
DOTD has appealed alleging twelve assignments of error.

FAULT OF DOTD
In the second, third, fifth and sixth assignments of error DOTD contends that the trial court erred in determining that a duty was owed by DOTD to Mrs. Rick; such duty, if any, was breached by DOTD; and that the alleged breach was both the cause in fact and legal or proximate cause of the accident.
In order to determine the liability of DOTD under La.C.C. art. 2315 the court must use a duty-risk analysis: "Was defendant's conduct a cause in fact of the accident? Did defendant owe a legal duty which encompassed the particular risk of harm to which plaintiff was exposed? Did defendant breach that duty? What damages, if any, did plaintiff sustain?" Forest v. State, Department of Transportation, 493 So.2d 563, 569 (La.1986).

a) Duty and Breach of Duty
DOTD contends that it has no duty to maintain, provide protective devices or signalize railroad grade crossings on roads which are not part of the State Highway System (off system grade crossings).
In written reasons for judgment the trial court determined that DOTD owed to Mrs. Rick the "duty to see that this particular crossing was properly upgraded with the installation of active grade crossing warning devices so as to render the grade crossing reasonably safe, which duty was bre[a]ched, and the bre[a]ch of the duty was a concurrent cause of the fatal accident." The court cited Arnold v. Illinois Central Gulf Railroad, 501 So.2d 778 (La. App. 1st Cir.1986), writ denied, 503 So.2d 479 (La.1987) for the imposition of this duty on DOTD.
The issue of whether a defendant owes a duty to protect the plaintiff from the particular type of harm arising in a particular manner is a question of law. Jones v. Johnson, 572 So.2d 150 (La.App. 1st Cir.1990), writs denied, 576 So.2d 519 (La.1991).
It is uncontested that MPR is not part of the state highway system. It is a local road. There is also no evidence that DOTD contracted with either the parish or municipality to maintain it. Generally, the DOTD has no duty to maintain or signalize a public road unless such road is expressly included in the state highway system (La. R.S. 48:191-193) or unless the state has contracted (or otherwise assumed the duty) to maintain the road. Breshers v. Department of Transportation and Development, State of Louisiana, 536 So.2d 733 *1153 (La.App. 3d Cir.), writs denied, 541 So.2d 854, 856 (La.1988); Wall v. American Employers Insurance Co., 215 So.2d 913 (La. App. 1st Cir.1968), writ denied, 253 La. 325, 217 So.2d 415 (1969). This general rule includes the signing or erecting of protective safety devices at intersections and warning of hazardous locations on the highway.
Federal funding has been appropriated and made available to each state since 1974 pursuant to 23 U.S.C. Sec. 130(a) for the "elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings, the reconstruction of existing railroad grade crossing structures, and the relocation of highways to eliminate grade crossings...." In order to receive the funds each state is required to "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings." 23 U.S.C. Sec. 130(d). At least one half of the federal funds authorized for and expended for the elimination of hazards of railway crossings must be available for the installation of protective devices at railway-highway crossings. 23 U.S.C. Sec. 130(e).
Since at least 1978, the federal government placed no restrictions on use of the annual $3,500,000 of funds available to the state to achieve the elimination of hazards at off system crossings. From 1974 when the funds were first made available the state used the funds exclusively to upgrade on system crossings (those crossings intersecting with state highways). In 1983 the state decided to use the funds to upgrade off/system crossings as well.
There are a total of approximately 4,300 railroad grade crossings (of public roads) in the state, 950 of which are on system. The cost of installing protective devices is approximately $80,000 to $100,000 per crossing. It is uncontested that whether the MPR crossing was to be upgraded with protective devices with federal, state, parochial or municipal funds, ICRC would be performing the labor to install them. The only way in which a parish or city could obtain the federal funds to defray the cost of upgrading a crossing was through DOTD in the manner prescribed by Congress through the Federal Highway Administration (FHA).
In written reasons for judgment the trial court found:
[D]efendant admitted at trial that it had abandoned its prior policy to that effect so that by 1984 off-system grade crossing (sic) were considered equally along with on-system grade crossings for prioritization and qualification under this federal aid program, defendant legally has no excuse or justification for failing to have done what was within DOTD's power to see that this particular grade crossing received appropriate prioritization and consequent installation of active warning devices long before July 20, 1988. Defendant offered absolutely no evidence to explain or justify why this Minnesota Park grade crossing was not given priority consideration, and was not even listed as a project until September of 1986.
The factors considered by DOTD in determining which crossings will be upgraded are: the New Hampshire rating index, accident history, requests for upgrade, and site distance. The higher the rating index, the greater potential for accidents.
The New Hampshire rating index given to the MPR crossing by DOTD in September 1986 was 6.132. This is a low rating suggesting a low priority. The New Hampshire formula utilizes several factors: the volume of daily trains, the volume of daily vehicular traffic and the protection factors already in place at the crossing (stop signs, etc.). Michael Morgan, the DOTD Agreements Engineer, stated that an outdated vehicular traffic count was used to compute the formula. Thus, the rating index was artificially low. Mr. Morgan computed the New Hampshire formula using the updated vehicular counts and arrived at rating indices of 54 and 72 which *1154 he stated were fairly high to high respectively.
Robert Ehrlich, accepted as an expert in mechanical engineering and accident reconstruction, testified on behalf of plaintiffs. He stated that a New Hampshire rating index of 54 or 72 is very high, indicating a dangerous crossing which should be investigated and signalized as soon as possible because the higher the volume of trains and motor vehicles through a grade crossing the greater the probability of an accident.
A report entitled the "Effectiveness of Motorist Warning Devices at Rail-Highway Crossings" prepared by the U.S. Transportation Systems Center for the Federal Highway Administration in 1985, indicates that the installation of standard highway stop signs at crossings with passive signs are 35% effective in reducing the number of accidents. Stop signs are recommended for improving the safety of crossings due to their effectiveness and low cost under certain conditions (e.g. single tracks, high train volumes and low highway traffic density). The use of crossbucks showed no significant level of effectiveness. The effectiveness of warning device upgrades in preventing accidents was as follows: from passive to flashing lights70%; from passive to automatic gates83%; and from flashing lights to automatic gates69%.
DOTD either was aware or should have been aware that in 1982 the traffic volume at Minnesota Park Road was 3,186 vehicles per day. This information was obtained from the "1982 Hammond Area Capacity and Safety Study in Highway and Major State Plans" which was apparently part of a DOTD Traffic and Planning Division study of urban traffic flow. Another traffic study, the "Hammond, Louisiana Traffic Impact Study" published in December, 1984, showed the daily vehicle count at the MPR crossing was 4,840. DOTD apparently did not avail itself of this study. Had DOTD used the figures from the vehicular traffic count of either study in computing the New Hampshire formula the rating index of this crossing would have been much higher, indicating a much higher priority for timely upgrading.
Dr. Joseph Blaschke, accepted as an expert in civil engineering, traffic engineering, accident reconstruction, and the design of railroad crossing control devices testified on behalf of DOTD. He stated that the advance warning sign, cross buck and a stop sign which were installed at the Minnesota Park Road crossing provided appropriate warning to drivers, providing them with the opportunity to respond. On cross examination he stated that given the accident history of three previous accidents at the crossing involving west bound vehicles, two with southbound trains and one with a north bound train, and the high New Hampshire Formula index rating, the installation of active warning devices was warranted.
Mr. Morgan stated that where dual sets of tracks exist at a grade crossing, automatic gates are usually installed because dual tracks increase the hazard of the intersection due to the fact, that at the same time, trains may travel through the crossing from opposite directions. He further stated that DOTD has the final decision of whether any grade crossing will be upgraded.
Mr. Morgan described the procedure which must be followed by DOTD for obtaining the federal funds for its upgrade projects. It begins with the selection of a crossing for upgrade. The proposed project list is sent to the FHA which must initially approve the list. DOTD then arranges a joint on site inspection by railroad and DOTD personnel after which the railroad must prepare plans and estimates for the project. The plans and estimates are forwarded from the railroad to DOTD. DOTD prepares a project notice, and sends it to the railroad for approval. The railroad sends the approved project notice to the Maintenance Department of DOTD; from DOTD it is sent to the FHA for final approval of the project. After final approval DOTD prepares the work order which is sent to the railroad after receipt of which the railroad begins installation. *1155 Morgan stated that the FHA usually approves all projects proposed by DOTD.
Morgan stated that the proposed project list which included the MPR crossing was submitted to the FHA for initial approval on September 10, 1986. The approved list was received by DOTD which scheduled an on site inspection with ICRC for April 7, 1987. DOTD forwarded an inspection report to ICRC on April 13, 1987. ICRC did not submit the plans and estimates to DOTD until September 2, 1988. DOTD prepared the project notices and forwarded them to ICRC on September 7, 1988. The work order was prepared on November 2, 1988. The work was completed in December, 1988.
Morgan stated that the time was "long" between the on site inspection and the time when ICRC submitted the plans and estimates. The normal lag time was three months. Morgan did not follow up with ICRC to attempt to have ICRC speed up the plans and estimates for the upgrade. Further, Morgan stated that DOTD has no system to check whether such request to ICRC has "fallen through the cracks." No excuse or reason was given regarding ICRC's slow response and DOTD's failure to see that ICRC promptly complied.
DOTD was aware of the high volume of motor vehicle traffic and the high number of trains traveling through the MPR grade crossing from studies made available to it. It instead relied on outdated information when determining which off system-crossings to upgrade. It was aware that the existing signs were inadequate for such volume of traffic, and of the increased hazard, and that active warning devices dramatically and drastically decrease the number of accidents.
DOTD had been requested to upgrade the crossing as early as 1983. DOTD selected it for upgrade in 1986 but because of faulty data which it used that did not give the appropriate priority to the crossing, and because of DOTD's general lack of a system to carry an assumed upgrade to completion, the assumed project was not completed until December, 1988. Once the work order was prepared the actual upgrade took only a month. The upgrade consisted of signal lights, short arm automatic gates and a rubber crossing mat. DOTD assumed responsibility for the crossing in September, 1986 and had ample time in which to upgrade it prior to this accident. DOTD admits that it does not prioritize the crossings to determine which will be upgraded. It admittedly uses discretion as to which ones will be selected in that selection of a crossing for upgrade depends on requests, political pressure and rating indices.
In Arnold v. Illinois Central Gulf Railroad, 501 So.2d at 780, which involved the signing of an off system grade crossing we held that as a matter of state law "[t]he fact of the appropriation, coupled with the DOTD's undertaking of responsibility for marking this and other railroad crossings imposes a duty on the state to do so properly. Clearly, it was the duty of the DOTD to mark the crossing itself or to take steps so that the crossing would be marked by the DOTD with the cooperation of Illinois Central Gulf."
In Arnold the grade crossing was signed with a crossbuck. There was conflicting evidence whether it was erected by the state or the railroad. The Arnold court held that possible placement of the sign by DOTD and DOTD's 1983 policy change to begin using the federal funds to upgrade off system crossings constituted DOTD's assumption of a duty to eliminate or reduce as much as possible the hazards presented at this crossing. According to Arnold the duty of DOTD would have been the same whether it did or did not install the crossbuck.
Implicit in the duty to mark the off system grade crossing is the duty to do so properly, in a manner appropriate to the volume of traffic and other circumstances peculiar to the crossing. Id. at 780. As in other instances where DOTD has the duty to mark or sign a highway or intersection is the duty to sign it in such manner as will alert unwary drivers to unusually dangerous conditions. This duty extends to prudent and attentive motorists as well as those who are momentarily inattentive. *1156 Cooke v. Travelers Insurance Co., 590 So.2d 657 (La.App. 3d Cir.1991), writ denied, 592 So.2d 414 (La.1992).
We hold that here as in Arnold, the circumstances outlined above constitute the assumption by DOTD of the responsibility to upgrade this crossing at least as early as September of 1986 when it was selected for upgrade. The failure to do so within a reasonable time after assumption of the responsibility constituted a breach of DOTD's duty to sign this particular crossing. Consequently, after careful review of the record we conclude that the trial court was not manifestly erroneous in determining that DOTD had ample time in which to install the protective devices and upgrade the crossing and its failure to timely do so was a breach of a duty owed. Rosell v. ESCO, 549 So.2d 840 (La.1989).

b) Proximate cause and cause in fact
Since the use of automatic warning devices significantly decrease the number of accidents at grade crossings they are obviously more effective for warning attentive as well as momentarily inattentive motorists such as Mrs. Rick. Thus, the injury to Mrs. Rick was within the scope of the risk which the duty was designed to protect.
Cause in fact is a factual determination which may not be set aside absent manifest error. Rosell v. Esco, 549 So.2d 840 (La.1989). The trial court found that had active safety devices been timely installed the accident would not have occurred. After careful review of the record we find no manifest error in this determination. We cannot say that a physical barrier would not have prevented Mrs. Rick from slowly proceeding onto the track. She did stop in obedience to the signs in place and there is no reason to conclude that she would have breached a barrier.

DISCRETIONARY FUNCTION OF DOTD
In the fourth assignment of error DOTD contends that its selection of grade crossing projects for any given year was an exercise of DOTD's discretionary function. Thus, DOTD is shielded from liability pursuant to La.R.S. 9:2798.1.
La.R.S. 9:2798.1(B) provides that liability shall not be imposed on public entities where such liability is based on the exercise or performance, or failure to exercise or perform, policy-making or discretionary acts, when such acts are within the course and scope of their lawful powers and duties. Subsection (B) does not apply to acts or omissions not reasonably related to the legitimate governmental objective for which the policy-making power exists. La. R.S. 9:2798.1(C)(1).
In Fowler v. Roberts, 556 So.2d 1 (La. 1989), the Supreme Court adopted a two step test to determine whether the discretionary function exception applies to shield a public entity from liability. It does not apply when the statute, policy or regulation specifically prescribes a course of action. It does confer immunity where the discretionary action involves the permissible exercise of a policy judgment grounded in social, economic or public policy.
In contemplating the discretionary authority of a governmental entity for roads under its jurisdiction we stated:
We are of the opinion that the only policy decision that a governmental authority can make relating to a roadway, is whether or not to construct it (or assume responsibility for it in some cases) in the first place.
Once that decision is made related decisions such as the design, method of construction, number and placement of signs and signals, level of maintenance, etc. are operational decisions. If the effect of these decisions is that the roadway is made reasonably safe for travel, then the governmental authority responsible has no liability for accidents occurring thereon. La.R.S. 9:2708.1 does not grant immunity, and thereby pretermit consideration of whether the roadway is reasonably safe, where the alleged basis of liability is an operational decision.
Chaney v. National Railroad Passenger Corp., 583 So.2d 926, 930 (La.App. 1st Cir. 1991), (Citation omitted).
*1157 The facts and circumstances of the case before us are analogous to highway or public road cases. The decision by DOTD in 1984 to expend the allocated federal funds to upgrade off system grade crossings was a policy decision. Selection of this crossing for upgrade in 1986, and the subsequent failure to properly prioritize and implement the decision were operational decisions for which the statute provides no immunity from liability.

FAULT OF ICRC AND AMTRAK
In the eighth assignment of error DOTD contends that the planks or timber used in the road bed of the crossing, made the crossing "rough", thus ICRC is at fault for failing to maintain the crossing in a state of repair so as not to hinder traffic. DOTD further alleges ICRC was negligent in failing to timely prepare the plans and estimates thereby delaying the installation of the automatic devices. DOTD asserts that because the actions or inactions of ICRC were a cause of the accident the trial court erred in failing to assess fault on the part of ICRC and Amtrak.
In the seventh assignment of error DOTD contends that the trial court erred in excluding as evidence, the documents dismissing ICRC and Amtrak, i.e. Judgments of Dismissal and the "Receipt and Release" executed by plaintiffs and ICRC and Amtrak.
At trial DOTD offered as evidence the compromise and release agreements executed by plaintiffs and ICRC and the subsequent dismissal of ICRC as third party defendant. DOTD did not attempt to offer any such evidence relating to Amtrak. Plaintiffs objected to the introduction.
La.C.E. art. 408(A) provides that evidence of compromise is not admissible to prove liability. The trial court did not abuse its discretion in excluding the releases of ICRC and Amtrak and the subsequent judgment of dismissal of them as third party defendants.
ICRC and Amtrak were named third party defendants by DOTD. The third party actions against them were dismissed by summary judgment prior to trial and DOTD was not hampered or deprived of a fair opportunity to establish third party fault which must be proved by DOTD in order to have the judgment reduced by the alleged fault of ICRC and Amtrak. Raley v. Carter, 412 So.2d 1045 (La.1982). The trial court found that DOTD had not met its burden of proving the fault of ICRC and Amtrak, thus they were not joint tortfeasors. Although the condition of the crossing itself was rough and the trial court indicated that this rough condition could have distracted Mrs. Rick causing her to proceed so slowly that her car stalled, there is no evidence that such was the case. Consequently, it is speculative that the condition of the crossing for which ICRC would be responsible under La.R.S. 45:324 caused the accident.
After careful review of the evidence we find no manifest error in the trial court's finding that DOTD did not meet its burden of proving third party fault.

MOTION IN LIMINE
Prior to trial DOTD filed a motion in limine pursuant to 23 U.S.C. Sec. 409 seeking to exclude all evidence such as reports, surveys, train schedules, lists, or data compiled for the purpose of identifying, evaluating or planning the upgrading of the MPR crossing. It also sought to exclude the expert opinion of plaintiffs' expert in mechanical engineering, accident reconstruction, and auto, highway and railroad crossing design, Dr. Robert Ehrlich, whose testimony it was alleged would be based upon the above described data.
The trial judge deferred ruling on the motion until objectionable evidence was offered by plaintiffs which is the appropriate method of dealing with objections to evidence.
23 U.S.C. Sec. 409, prior to its amendment in 1991 by Pub.L. No. 102-240, 105 Stat. 1978, provided as follows:
Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident *1158 sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 152 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal aid highway funds shall not be admitted into evidence in Federal or State court or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data. (Emphasis added).
The statute clearly excludes the admission of data compiled for the specific purpose of eliminating hazards at railway-highway grade crossings. Martinolich v. Southern Pacific Transportation Co., 532 So.2d 435 (La.App. 1st Cir.1988), writ denied, 535 So.2d 745 (La.1989).
The primary objections by DOTD related to the admission of the rating index, accident history, volume of vehicular traffic, and the volume of train traffic relating to the MPR crossing.
Exhibit D-1 is the confirmation by the FHA that the MPR crossing was added to the list of the 1985-1986 priority projects. Included in the exhibit is the rating index ascribed to the crossing by DOTD, which was 6.132. The accident history of the crossing was comprised of State Uniform Motor Vehicle Traffic Reports obtained from the routine police investigation of motor vehicle accidents at the crossing. The data regarding the volume of train and vehicular traffic through the MPR crossing was also compiled for reasons other than specifically for the purpose of obtaining the federal funding for projects to eliminate hazards. Thus, the trial judge was correct in overruling DOTD's objections on these issues. This assignment is without merit.

APPORTIONMENT OF FAULT
In the ninth assignment of error DOTD contends that the trial court erred in assessing 50% fault to Mrs. Rick. It urges instead, that the degree of fault apportioned to her should be at least 75%.
Apportionment of fault is a factual determination which should not be set aside absent manifest error. James v. State Farm Mutual Automobile Insurance Co., 597 So.2d 555 (La.App. 1st Cir.1992). After careful review of the record we find no manifest error in the trial judge's factual determination in this regard.

QUANTUM

a) Special Damages
The trial court awarded to Mr. Rick the sum of $46,240.50 for past and future loss of support. DOTD contends this award was speculative.
Mrs. Rick had worked in the family business on a daily basis. Mr. Rick stated that for approximately eight months before her death the Ricks were attempting to sell their business. During that period, although she continued to work, she no longer drew a salary. This was an attempt by the Ricks to keep payroll costs down and profits higher for prospective sale purposes. Had the sale of the business gone through the Ricks planned to farm and transport catfish from Louisiana to Arizona during their semi-retirement.
The trial court found that Mrs. Rick had future earning capacity and was a source of partial support for her spouse. Plaintiff's expert economist estimated Mrs. Rick's lost earnings from date of death to trial was the sum of $23,504; the present value of future earnings to her average work life expectancy (6.84 years) is the sum of $53,708; the present value to age 65 is $83,964. The trial court awarded the sum of $46,240.50 which was reduced by 50%.
A reviewing court should not set aside an award of quantum unless an analysis of the facts and circumstances reveals the trial court abused its discretion in setting the award. Reck v. Stevens, 373 So.2d 498 (La.1979). After review of the record we find the award is supported by the record and is not an abuse of discretion.

*1159 b) General Damages
In the twelfth assignment of error DOTD contends the general damages awarded to plaintiffs is excessive.
The trial court awarded general damages in the amounts of $450,000 to Mr. Rick and $150,000 to each adult child. The award was reduced 50% by the comparative negligence of Mrs. Rick. DOTD argues the pre-comparative award to Mr. Rick should be reduced to $295,000 and that awarded to each adult child to $100,000.
It is uncontroverted that Mrs. Rick enjoyed a close and loving relationship with her husband and adult children. She was very devoted to her family and they to her. After careful review of the record, we find that only the $450,000 general damage award to Mr. Ricks was an abuse of discretion. An award of $300,000 is appropriate and in the upper range for loss of love, affection and companionship. See Keating v. Holston's Ambulance Service, 546 So.2d 919 (La.App. 3rd Cir.1989).

LEGAL INTEREST
In the eleventh assignment of error DOTD alleges that the trial court erred in awarding legal interest from the date of judicial demand pursuant to La.C.C. art. 2924. It should have been awarded pursuant to La.R.S. 13:5112.
La.R.S. 13:5112(C) limits the amount of prejudgment interest awarded against the state. It provides:
Legal interest on any claim for personal injury or wrongful death shall accrue at six percent per annum from the date of judicial demand until the judgment thereon is signed by the trial judge in accordance with Code of Civil Procedure Article 1911. Legal interest accruing subsequent to the signing of the judgment shall be at the rate fixed by Civil Code Article 2924.
Plaintiffs argue that application of the cap on prejudgment interest is an affirmative defense which should be raised prior to trial.
La.C.C.P. art. 1005 enumerates an illustrative list of affirmative defenses which may have the effect of defeating the suit on the merits. It should be specially pleaded in order to give fair and adequate notice of the nature of the defense to avoid surprising plaintiff at trial. The interest cap will not defeat the suit on the merits thus it is not an affirmative defense. Additionally, the interest cap is fixed by statute thus surprise does not result from the failure to plead the limitation. See Salter v. State Department of Health and Human Resources, 612 So.2d 163 (La.App. 1st Cir. 1991).
Plaintiffs' allegations that the statute at issue is unconstitutional will not be considered for the first time on appeal. Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308 (La.1984). Consequently, the judgment will be amended to provide for six percent interest from date of judicial demand until signing of the judgment and thereafter according to La.C.C. art. 2924.

DECREE
The judgment of the trial court is amended with reference to interest, and the general damage award to Mr. Rick is reduced to $300,000.
Costs in the sum of $547.50 are assessed against DOTD.
AMENDED AND AFFIRMED.
GONZALES, J., concurs in the result.
GONZALES, Judge, concurring.
I concur in the majority opinion; however, I do not agree that the release should have been excluded as evidence if the settlement with ICRC (or other Mary Carter-type agreement) contained an indemnity agreement because that would completely change the alignment of the parties, and it would be extremely relevant on the issue of bias or interest, and for that reason it has to come in under La.C.E. art. 408(A).
Civil cases. In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, anything of value in compromising or attempting to compromise a claim which was disputed as to *1160 either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This Article does not require the exclusion of any evidence otherwise admissible merely because it is presented in the course of compromise negotiations. This Article also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. (Emphasis added.)
When a compromise agreement contains an indemnity provision, the interest of the settling party may be completely aligned with the plaintiff, and the trier of fact must know this in weighing the credibility of the witnesses.
In the case of General Motors Corp. v. Simmons, 558 S.W.2d 855 (Tex.Sp.Ct.1977), overruled on other grounds by Duncan v. Cessna Aircraft Co., 665 S.W.2d 414 (Tex. Sp.Ct.1984), the court held:
Agreements with a settling defendant who remains a party at the trial and retains a financial stake in the plaintiff's recovery have been called "Mary Carter" agreements since the 1967 Florida decision of Booth v. Mary Carter Paint Co., 202 So.2d 8 (Fla.App.1967). Some courts have wholly voided the agreements as against public policy.... Most courts have addressed the issue, while not declaring these agreements void, have permitted the disclosure of the contracts to the jury when offered by a nonsettling defendant.... (Citations omitted.)
The Illinois Supreme Court wrote in Reese v. Chicago, B & Q R.R. Co., 55 Ill.2d 356, 303 N.E.2d 382, 387 (1973), that "the use of loan agreements1 tends to undermine the adversary nature and integrity of the proceedings against the remaining defendant." See also Kuhns v. Fenton, 288 So.2d 253 (Fla.1973); Ward v. Ochoa, 284 So.2d 385 (Fla.1973); Imperial Elevator Co. v. Cohen, 311 So.2d 732 (Fla.App.1975); General Portland Land Development Co. v. Stevens, 291 So.2d 250 (Fla.App.1974); Gatto v. Walgreen Drug Co., 61 Ill.2d 513, 337 N.E.2d 23 (1975); Michael, "Mary Carter" Agreements in Illinois, 64 Ill.B.J. 514 (1976). (Emphasis added.)
1. A "loan agreement" is one form of a Mary Carter-type settlement agreement. It is cast in the form of a loan that is to be repaid only if and to the proportionate extent that the plaintiff recovers against the other defendant. The "loan" is repaid out of the plaintiff's recovery against the other defendant. See Burkett v. Crulo Trucking Co., 355 N.E.2d 253, 258 (Ind. App.1976); Annot., 62 A.L.R.3d 1111, 1113 (1975). As the Supreme Court of Oregon has said:
Private agreements which constitute a partial settlement of a dispute between a plaintiff and two or more defendants and which retain the settling defendant as a party at the trial have become known as "Mary Carter agreements." Such agreements may take on various forms depending upon the factual setting in an individual case and the underlying law in the particular jurisdiction. Grillo v. Burke's Paint Co., 275 Or. 421, 551 P.2d 449, 452 (1976).
In Ward v. Ochoa, 284 So.2d 385 (Fla.Sp. Ct.1973), the court stated:
A "Mary Carter Agreement", however, is basically a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."
Renowned authorities on evidence have noted:
It has sometimes been thought that the use of compromise evidence to impeach should be a true exception to the rule; i.e., that it should be admitted despite the *1161 fact that it is necessary to infer the validity or invalidity of the compromised claim because this is necessary to afford the opponent an adequate right to cross-claim the witness. The argument is made that unless such evidence is admitted, parties will engage in "compromises" that are little more than bribes to secure favorable testimony.
Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure, (Federal Rules of Evidence) § 5311 (1980). Since the release is not in the record, we cannot tell whether the trial court abused its discretion. Because it is the duty of the appellant to make his complete record, I am forced to concur in the majority's finding on this point.
NOTES
[1] The crossing at time of trial consisted of only one set of tracks.